**William Alfred ROBINSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69568.

Court of Criminal Appeals of Texas, En Banc.

April 17, 1991.

Rehearing Granted July 3, 1991.

Opinion Denying Motion for Rehearing Feb. 10, 1993.

Catherine Green Burnett and Janet Morrow (court appointed on appeal), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and William J. Delmore, III, Bert Graham & J. Harvey Hudson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Judge.

Appeal is taken from a conviction for capital murder. *See* Tex. Penal Code § 19.-03(a)(2). After finding appellant, William Alfred Robinson, guilty, the jury answered affirmatively the special issues required by Article 37.071(b) of the Texas Code of Criminal Procedure, and punishment was assessed at death. Direct review by this Court was then automatic. *See* Art. 37.-071(h). On original submission, we abated the appeal and remanded the cause to the trial court for an evidentiary hearing regarding appellant's claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Robinson v. State*, 738 S.W.2d 673 (Tex.Cr.App.1987). The record

of the *Batson* hearing, together with the trial court's findings of fact and conclusions of law relevant thereto, have been forwarded to us. We will now affirm.

Viewed in the light most favorable to the verdict, the evidence[1] at trial showed that shortly after midnight, on June 12, 1985, appellant and two male accomplices robbed Steven Michael Creasey and his female companion at gunpoint in the Montrose section of Houston. During the course of the robbery, Creasey was shot and killed, either by appellant or one of his accomplices. *See* footnote 2, post. After Creasey's death, appellant and the others abducted and sexually assaulted Creasey's companion for approximately three hours. Creasey's companion was then released.

In sixteen points of error, appellant challenges the trial court's denial of a pretrial motion to suppress his inculpatory written statement; the trial court's refusal to adopt an alternative method of jury selection; the trial court's refusal to sustain appellant's *Batson* claim; the trial court's refusal to let him question four veniremen; the trial court's granting of the State's challenge of another venireman for cause; the trial court's denial of a mistrial based on juror "misconduct;" the trial court's denial of a special issue asking the jury whether it considered appellant's inculpatory written statement; the trial court's submission, to the jury, of the third special issue under Article 37.071(b); the trial court's refusal, at the punishment stage, to instruct the jury regarding uncharged misconduct; the validity of the jury selection method utilized at his trial; the validity, as applied to his case, of Article 37.071(b); and the validity of the Texas death penalty scheme under the Eighth and Fourteenth Amendments.

■ In his first point of error, appellant argues the trial court erred in denying his pretrial motion to suppress an inculpatory written statement he gave to police shortly

---

1. Appellant does not challenge the sufficiency of the evidence to support the finding of guilt or the assessment of punishment.

after his arrest.[2] Appellant contends the statement was obtained in violation of his right to counsel under the Fifth Amendment.[3] More specifically, appellant contends that before he signed the statement he effectively requested the assistance of counsel, that the request was not honored, and that thereafter he did not initiate contact with the police.[4]

The record reflects that appellant filed a pretrial motion requesting suppression of, inter alia, "the written statement of the Defendant which ... was taken in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution." A pretrial hearing was held on the motion. At the hearing appellant requested suppression of the statement on the ground "the actions taken on behalf of the police officers and members of the D.A.'s Office and judiciary of this State ... violated [appellant's] Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States, those rights guaranteed to him under those amendments." There is nothing else in the record, or in appellant's brief to this Court, suggesting that the trial court and State's counsel were ever apprised of the specifics of appellant's objection to the admissibility of his written statement. On this record, then, we could properly overrule appellant's first point of error as not preserved for appellate review. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Cr.App.1990). In the interests of justice, however, we will proceed to explain why appellant's argument has no merit.

At the pretrial hearing, only the State presented evidence, which consisted principally of the testimony of five witnesses. After the hearing, the trial court filed detailed written findings of fact and conclusions of law. Appellant does not now contest the accuracy of the fact-findings or their support in the record, and our examination of the record shows that they are indeed well-supported by the record.[5]

The trial court's fact-findings may be summarized as follows: Appellant, then–27 years old, was arrested around 5:00 p.m., June 24, 1985, in Dallas. At the time of the arrest, the arresting officer explained to appellant his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That is, the arresting officer explained that appellant had the right to remain silent, that any statement he made could be used against him at trial, that he had the right to an attorney before and during any questioning, and that if he could not afford an attorney one would be appointed for him. Immediately after his arrest, appellant was taken to the Dallas County jail facility, where a magistrate again explained to him his rights under *Miranda*.

Appellant was later taken to a Dallas police station, where, at approximately 1:30 a.m., June 25th, another police officer explained his *Miranda* rights to him a third time. After explaining those rights, the officer asked appellant whether he understood them, and appellant responded that he did. The officer then asked appellant whether he would give a statement regarding the murder of Steven Creasey. Appellant again responded that he would, and then he gave the statement, which was reduced to written form. After the state-

---

**2.** In the statement appellant admitted participating, along with two others, in the robbery of Steven Creasey, but he insisted that one of the others actually shot and killed Creasey. The statement was the only evidence at trial from which the jury could have found that appellant was guilty only as a party.

**3.** The Fifth Amendment was made applicable to the States by the due process clause of the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

**4.** Appellant argues also that his written statement was obtained in violation of his privilege

against self-incrimination guaranteed by Article 1, § 10, of the Texas Constitution. However, because appellant has provided no argument or authority regarding the protection afforded by Article 1, § 10, we consider the point inadequately briefed and will not address it. *See* Tex.R.App.Proc. 74(f) and 203; *McCambridge v. State,* 712 S.W.2d 499, 501–502 n. 9 (1986).

**5.** The trial court is, of course, the sole judge of the credibility of the witnesses at a pretrial suppression hearing. *Lucas v. State,* 791 S.W.2d 35, 47 (Tex.Cr.App.1989).

ment was read back to appellant verbatim, the interviewing officer asked him whether he would sign it.[6] Appellant responded with a question of his own: "Do I need to talk to a lawyer before I sign?" The officer answered that appellant could have a lawyer if he desired one, and then appellant stated that he was willing to sign immediately without a lawyer. Out of an abundance of caution, however, the officer refused to allow appellant to sign the statement, explaining to him that first he would have to be taken again before a magistrate, who would explain his *Miranda* rights yet again.

Shortly after 5:00 p.m. on June 25th, appellant was taken before a magistrate in Houston, after having been transported from Dallas. The magistrate explained to appellant his *Miranda* rights yet again and then asked appellant whether he understood those rights, and appellant stated that he did. The magistrate then read to appellant the statement he had given the night before in Dallas and again asked him whether he wanted to sign the statement without first consulting an attorney. Appellant responded that he did want to sign, even before consulting an attorney, and he did so.

In its fact-findings, the trial court found also that "[t]here was no evidence that the defendant ever appeared to be mentally or physically disabled or under the influence of any form of intoxicant" during the period in question, and that appellant was in no way coerced into making or signing the written statement. We note also that appellant does not argue to us that he had less than the normal use of his mental and physical faculties at the time he signed the written statement.

■ We turn now to a summary of the relevant legal principles. The Fifth Amendment privilege against self-incrimination protects an individual from being compelled by the state to be a witness against himself. *See generally Holloway v. State,* 780 S.W.2d 787 (Tex.Cr.App.1989).

In *Miranda,* the Supreme Court established procedural safeguards to protect the exercise of the Fifth Amendment privilege from the inherently coercive effects of custodial interrogation. This is not to say, however, that the police are free to interrogate whenever they have given the requisite warnings. The Court in *Miranda* went on to hold that if, after the warnings are given, the defendant is interrogated and a statement obtained, it will be admissible at trial only if the prosecution demonstrates that the defendant waived his rights voluntarily, knowingly, and intelligently. 384 U.S. at 475, 86 S.Ct. at 1628. *See also Tague v. Louisiana,* 444 U.S. 469, 470–471, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980). Such waiver must be proven by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). If the prosecution shows that a suspect's decision not to rely on his *Miranda* rights was uncoerced, that he at all times knew he could stand mute and consult a lawyer, and that he was aware the State could use his statements against him, the State's burden of proof is met and waiver shown as a matter of law. *Moran v. Burbine,* 475 U.S. 412, 422–423, 106 S.Ct. 1135, 1141–1142, 89 L.Ed.2d 410 (1986).

■ On the other hand, if a suspect, after being given the *Miranda* warnings, does request the assistance of counsel, "interrogation must cease, and officials may not reinitiate interrogation without counsel present." *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990). *See Murphy v. State,* 801 S.W.2d 917 (Tex.Cr.App.1991). The mere mention of the word 'attorney' or 'lawyer', without more, however, does not automatically invoke the right to counsel. *Lucas v. State,* 791 S.W.2d 35, 45 (Tex.Cr.App.1989). Where, as in the instant case, "a person's invocation of his right to counsel is not clear and unambiguous, but is instead equivocal, the interrogating officers are not required to automatically cease the in-

---

**6.** Under Article 38.22 of the Texas Code of Criminal Procedure, a written statement made by an accused as a result of custodial interrogation is not admissible unless signed. *Nehman v. State,* 721 S.W.2d 319, 323 n. 2 (Tex.Cr.App.1986).

terview, but may continue questioning as long as the questions are specifically aimed at discovering whether the accused indeed wants to consult with counsel or wishes to proceed with the interview without benefit of counsel." *Id.* at 46. *See also Russell v. State,* 727 S.W.2d 573 (Tex.Cr.App.1987).

Applying these principles to the case before us, it is plain that appellant's written statement was not obtained in violation of his right to counsel under the Fifth Amendment. Appellant's "request" for counsel was equivocal at best; further questioning was limited to ascertaining his wishes regarding presence of counsel; and his knowing and intelligent waiver of counsel was shown as a matter of law. Point of error number one is therefore overruled.

In point of error number two, appellant argues the trial court erred in denying his pretrial motion to suppress his written statement because it was obtained in violation of his Sixth Amendment[7] right to counsel. Again, appellant argues that before he signed the statement he effectively requested counsel and that thereafter he did not initiate contact with the police.[8]

We note initially that point of error number two is no more preserved for our review than is point of error number one, and for the same reasons. *See ante* at 222. But, again, in the interests of justice, we will explain why appellant's argument has no merit.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel." This right to counsel attaches at the formal initiation of adversary judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). If an accused is interrogated after the right

to counsel has attached, and a statement obtained, the police may not use that statement against the accused unless counsel was present or waived when the statement was obtained. *Brewer, supra* at 399–404, 97 S.Ct. at 1239–1242. The burden is again on the State to prove such a waiver was made voluntarily, knowingly, and intelligently. *Patterson v. Illinois,* 487 U.S. 285, 292–293, 108 S.Ct. 2389, 2394–2395, 101 L.Ed.2d 261 (1988); *Brewer, supra* 430 U.S. at 404, 97 S.Ct. at 1242. Waiver is shown as a matter of law with regard to pretrial questioning if an accused (1) who has not yet retained or been appointed counsel (2) decides voluntarily not to rely on his right to counsel and (3) that decision is made with the understanding that he could remain silent and request a lawyer and that the State could use any statement he gave against him. *Patterson, supra* 487 U.S. at 297, 108 S.Ct. at 2397. If, on the other hand, an accused does request the assistance of counsel after his Sixth Amendment right has attached, then the police may not initiate any questioning of him or attempt to induce him to waive his right to counsel unless counsel is first provided. *Michigan v. Jackson,* 475 U.S. 625, 635–636, 106 S.Ct. 1404, 1410–1411, 89 L.Ed.2d 631 (1986). But, again, the mere mention of the word "attorney" or "lawyer" does not amount to a request for counsel. *Lucas, supra* at 45–46.

Assuming arguendo that appellant's Sixth Amendment right to counsel had attached at the time he signed the written statement and that the giving of the statement constituted a "critical stage" to which the right applied, *see Holloway, supra* at 791 n. 3, we still have no difficulty determining that right was not infringed. Appellant never clearly requested counsel, and the State proved his knowing

---

7. The Sixth Amendment was made applicable to the States by the due process clause of the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963).

8. Appellant argues also that the statement was obtained in violation of his right to counsel

under Article 1, § 10, of the Texas Constitution. But, again, because appellant has provided no argument or authority regarding the protection afforded by Article 1, § 10, we deem the point inadequately briefed and will not address it. *See* note 4, ante.

and intelligent waiver as a matter of law. Point of error number two is overruled.

■ Appellant contends in point of error number five [9] that the trial court erred "in refusing an alternative method of jury selection that would insure a representative cross-section of the community." More specifically, he argues that the jury wheel method used to select the venire was invalid because it failed to "insure[ ] ... a venire comprised of a representative cross-section of the community" in violation of unspecified "equal protection guarantees" as well as unspecified protections provided by Article 1, §§ 9 and 10, of the Texas Constitution.

The record reflects that on the fourth day of jury selection, appellant's counsel complained to the trial court that only two of the first 26 veniremen brought to the courtroom for examination were black, although the population of Harris County was, at the time of trial, approximately 20 percent black. Shortly thereafter, defense counsel moved that the trial court modify the jury selection method:

> DEFENSE COUNSEL: I would ask the Court, further, ... to take notice of the demographics of the voter-registration lists from which jurors are selected; that a more equitable way, in order to obtain balance of the prospective jurors here— and I'm not sure how we get the ones that we're getting. But to go over to the central jury room without having access to their background data. The State picked three and we simply picked three from the faces or any other equitable method, to obtain a fair cross-section of the veniremen who constitutionally vote in this State of Texas, so that this defendant [will] get a jury of his peers.
>
> THE COURT: That's denied.

There is nothing in the record or in the briefs suggesting that appellant specified to the trial court and State's counsel *any* constitutional or statutory provisions in support of his motion. Moreover, appellant has not specified to this Court any *particu-*

*lar* constitutional or statutory protections in support of his argument. We hold, therefore, that any error has not been preserved for our review. *Rezac, supra* at 870; *Pierce v. State*, 777 S.W.2d 399, 416 (1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990). Point of error number five is overruled.

■ In his sixth point of error, appellant, relying upon *Batson v. Kentucky, supra,* argues the trial court erred in denying his pretrial motion to quash the jury based on the prosecutors' peremptory strikes of four black veniremen. Appellant argues that he made out a prima facie showing of unconstitutional racial discrimination and that the prosecutor failed, as a matter of law, to rebut that prima facie showing.

At the *Batson* hearing, the State and appellant stipulated, inter alia, that appellant is black; that twelve of the 81 veniremen were black; that the two prosecutors at trial challenged four black veniremen for cause (successfully) and six blacks (veniremen Hodge, Broussard, Sampson, Pollard, King, and Sims) peremptorily; that appellant struck one black peremptorily; and that one black served on the jury. Appellant relied upon this stipulated evidence to make his prima facie case. Although the trial court was not satisfied that a prima facie case of racial discrimination had been made, it nonetheless invited the State to provide neutral, relevant explanations for the challenged peremptory strikes.

The State accepted the trial court's invitation and presented the testimony of the two men who had served as prosecutors at appellant's trial. The first prosecutor testified that he peremptorily struck venireman Hodge because "she was very equivocating as far as whether she could actually participate as a juror on a [capital] case and assess the death penalty" and because "she indicated she thought premeditation should be a necessary prerequisite before the death penalty was assessed." He testified

---

**9.** We deal with appellant's points of error in the same order as the alleged errors occurred at trial.

next that he struck venireman Broussard because of Broussard's statement "that he did not feel that capital punishment was just and necessary [or had ever] been effective in preventing crime." He testified also that he struck venireman Sampson because she "waffled back and forth" "about whether she could participate in assessing the death penalty." Finally, the first prosecutor testified that he peremptorily struck venireman Pollard because "it turned out Mr. Pollard himself had been prosecuted for murder [and had] been convicted."

The second prosecutor testified that he struck venireman King peremptorily because King "indicated ... that he did not believe in the death penalty," and that he struck venireman Sims because Sims indicated "he could only give a death penalty on premeditated murder."

At the conclusion of the *Batson* hearing, the trial court stated on the record that he found the State's explanations for the challenged peremptory strikes to be "neutral, relative, clear, and legitimate as required by *Batson* and not racially motivated."

■ The equal protection clause of the Fourteenth Amendment prohibits purposeful racial discrimination by the State in its use of peremptory strikes. *Batson v. Kentucky, supra* 476 U.S. at 84, 106 S.Ct. at 1716; *see generally Williams v. State,* 804 S.W.2d 95 (Tex.Cr.App.1991); 2 LaFave & Israel, *Criminal Procedure* § 21.3 (Supp. 1990). "[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." *Powers v. Ohio,* — U.S. —, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). To establish a prima facie case [10] of purposeful discrimination under *Powers* and *Batson,*

> the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those

to discriminate who are of a mind to discriminate. [Next], the defendant must show that [this] fact[ ] and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race....

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination....

> Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging [the] jurors [in question]. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.... The prosecutor ... must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination.

*Batson, supra* 476 U.S. at 96–98, 106 S.Ct. at 1722–1724 (citations and some quotation marks omitted). "Since the trial court's findings ... largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21. Indeed, a reviewing court must view the evidence presented at the *Batson* hearing in the light most favorable to the trial court's ruling, and must not disturb the trial court's findings unless they are clearly erroneous, i.e., unless the reviewing court is left with a firm conviction that a mistake has been committed. *Whitsey v. State,* 796 S.W.2d 707, 721 (Tex.Cr.App. 1990) (op. on reh'g).

---

**10.** A prima facie case in this context is, of course, that minimum quantity of evidence necessary to support a rational inference that the allegation of purposeful discrimination is true. *Dewberry v. State,* 776 S.W.2d 589, 590 (Tex.Cr. App.1989). Once a prima facie showing has been made, the allegation of discrimination must be found true unless rebutted by other evidence. *Id.*

Assuming arguendo that appellant made a prima facie showing at the *Batson* hearing, and viewing the evidence presented at that hearing in the light most favorable to the trial court's finding of no purposeful discrimination, we conclude that the trial court's finding is not clearly erroneous. The prosecutors' explanations for their peremptory strikes were plainly of the variety previously upheld by this Court. *See Tennard v. State*, 802 S.W.2d 678, 681–682 (Tex.Cr.App.1990); *DeBlanc v. State*, 799 S.W.2d 701, 711–713 (Tex.Cr.App.1990); *Keeton v. State*, 749 S.W.2d 861, 870 (Tex.Cr.App.1988). Point of error number six is overruled.

■ In points seven through ten, appellant complains of the trial court's refusal at voir dire to allow him to question veniremen Davis, Edmonds, Webster, and Carroll before they were excused for cause. *See Drinkard v. State*, 776 S.W.2d 181, 184–188 (Tex.Cr.App.1989); *Perillo v. State*, 656 S.W.2d 78, 81–82 (Tex.Cr.App.1983). The record reflects that the four veniremen were excluded for cause, because of their beliefs regarding the death penalty, immediately after examination by the prosecutor.

We need not reach the merits of appellant's argument, because the record also reflects that he did not lodge a timely and specific objection to the trial court's refusal to allow further questioning. Thus, any error has not been preserved for our review. *Crane v. State*, 786 S.W.2d 338, 345 (Tex.Cr.App.1990). Points of error seven through ten are overruled.

■ Appellant maintains in his twelfth point of error that the trial court violated his Sixth Amendment right to an impartial jury when it excused venireman Seymore for cause because of Seymore's bias against the death penalty. Appellant argues that when Seymore's answers to the voir dire questioning are examined as a whole, they reveal "that he could follow the law and apply it to the facts."

The relevant portions of the voir dire record are as follows:

Q: [by the Court] ... Do you yourself have any conscientious, religious, or moral scruples against the infliction of death as a punishment for crime in a proper case?

A: No, I don't.

\* \* \* \* \* \*

Q: [by prosecutor] I guess the first thing I'd like to find out [is] where you think capital punishment fits into our system of justice?

A: I feel like someone, ..., if they kill someone and they're also a threat to come back into society to kill someone, they should be given the death penalty.

Q: ... Do you feel like if you were selected as a juror, you could participate and sentence someone to the death penalty?

A: No, not personally, to be honest with you.

Q: ... Can you imagine any set of facts ... in which, if you were selected as a juror, you could return a verdict that resulted in the death penalty?

A: No, not right offhand.

Q: ... What I need to find out is this: If you feel like if you were selected as a juror, you are going to always, regardless of the facts, ..., you are always going to vote in such a way that the person does not receive the death penalty?

\* \* \* \* \* . \*

A: What I'm saying is, I probably couldn't vote to have someone given the lethal injection.

Q: ... [C]an you imagine ever ... participating as a juror in which, by your verdict, the judge sentenced somebody to die by lethal injection?

A: No.

Q: ... Are you telling me that because of your personal feelings, you could never answer both of those [special issues] yes—

A: Yes.

Q: —knowing that the result will be that ... Mr. Robinson will receive the death penalty?

A: That's correct.

\* \* \* \* \* \*

Q: [by the Court] Mr. Seymore, would your answers be the same no matter what the facts and circumstances of the case might reveal to you?

A: Yes, it would be, Your Honor.

Q: Could you ever participate with eleven other jurors in answering those two questions yes, knowing that the defendant would receive the death penalty, regardless of what the facts in the trial might be?

A: No, I couldn't, Your Honor.

\* \* \* \* \* \*

Q: [by defense counsel] Now I need to know: Is there a proper set of circumstances in your mind where, if the State—you were sitting as a juror—where the State brought you ample evidence to prove to you beyond a reasonable doubt that those two questions should be yes and you knew they should be yes ..., would you follow the law and answer them yes?

A: To the best of my ability, I would.

\* \* \* \* \* \*

Q: [by the Court] Knowing, Mr. Seymore, that if you and eleven others each answer both of those questions yes, the defendant is going to receive the death penalty?

A: If the State says I have to serve on the jury and given this—given the proper case, Your Honor, and listen to the evidence, I—I would have to, I guess, vote yes.

\* \* \* \* \* \*

Q: Would you always automatically answer those two questions or one or the other of them in such a way that would prevent the defendant on trial from receiving the death penalty, no matter what the facts of the case may be?

A: No, I could not.

Q: No, you could not, what?

A: I could not vote for the man to receive the death penalty. I could vote for the man to receive life in prison.

\* \* \* \* \* \*

Q: ... If both of those questions are answered yes, by a unanimous verdict,

it's death. If either one is answered no, it's life imprisonment.

A: I would always have to vote for a life sentence. I could never personally vote to have a man put to death.

\* \* \* \* \* \*

The Court: You're excused, sir.

\* \* \* \* \* \*

Defense Counsel: Our position, Your Honor, is that he was qualified under ... [*Wainwright v.*] *Witt.*

The Court: The record will certainly reflect your objection.

 The State may challenge for cause any venireman who "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." Tex.Crim.Proc. Code art. 35.16(b)(3). Because of the Sixth Amendment right to an impartial jury, however, a venireman may not be challenged for cause based on his views about the death penalty unless those views would substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *see* 2 LaFave & Israel, *Criminal Procedure* § 21.3 at 733 (1984 & Supp.1990). A trial court's decision to sustain such a challenge for cause is due great deference and will not be disturbed on appeal so long as the venireman's testimony reasonably indicated that he would be unable to do his task well enough if selected. *Goodwin v. State,* 799 S.W.2d 719, 731 (1990); *Hernandez v. State,* 757 S.W.2d 744, 753 (Tex.Cr.App. 1988).

Applying the appropriate standard to the record in this case, we perceive no error. *See Crane v. State, supra* at 344. Point of error number twelve is overruled.

 In point of error number three, appellant argues the trial court erred in denying his motion for mistrial after it was learned that a juror "had received evidence outside the record" of uncharged misconduct on his part. Appellant maintains that the juror became "disqualified" to serve

once she "received" the "evidence" in question.

The facts relevant to this issue are as follows: At the close of the evidence at the guilt/innocence phase, appellant's counsel informed the trial court that an article regarding appellant's trial had appeared the previous day in the *Houston Chronicle* newspaper. Defense Counsel told the Court he was concerned about the article because it did "not accurately reflect the testimony" of the State's key witness. He then requested the court "to make inquiry of the jurors as to whether or not they read that specific article." The trial court complied with appellant's request and questioned each juror under oath, individually, and out of the presence of the others. Only Juror Romano testified she was aware of the article:

Q: [by the Court] During your service as a juror, have you read an article that appeared in the *Houston Chronicle* October 29, 1985, concerning this case, written by a reporter, Mr. John Makeig?

A: No, I did not read it. But I have to tell you one other thing. My sister did and accidentally said something to me.

Q: Tell me what she said.

A: She said that she read where the third man had been killed by the other two.[11]

The Court: Any questions, [defense counsel]?

Defense Counsel: At this time I just move for a mistrial, Your Honor.

The Court: Any questions, [prosecutor]?

Q: [directed to Juror Romano, by the prosecutor] Ms. Romano, from your listening to the testimony of the last three days, do you recall the Judge instructing that you would be reaching any verdict you might have in this case based upon the evidence you were presented from the witness stand and the law as the Judge would instruct you?

A: Yes.

Q: Anything not legally admissible or competent evidence you would not consider for any purpose; is that correct?

A: Yes.

Q: This would be just as when we talked in voir dire about the issue if you heard testimony concerning a confession and if a jury decided the confession was not proper, you realize the law says you would have to set aside the fact you had heard that confession?

A: Yes. In fact, when she said that, I said, "Don't tell me anything. I'm not supposed to know it." She didn't know she was saying anything.

Q: Do you understand and recall there has been no testimony in this case regarding how [the alleged accomplice] met his demise?

A: That's right.

Q: Would you be able to tell the Judge you can follow his instructions as he has told you and base whatever verdict you may reach solely upon the evidence you have heard and not on anything else you may have heard?

A: The only thing I did hear about his demise was what I heard this afternoon.

Q: All right. In other words, any verdicts you reach in this case would be based upon your interpretation of the evidence you heard from the witness stand?

A: Yes.

Q: And it would not be affected in any form or fashion by anything else you may have heard?

A: No.

Q: [by the Court] You understand the evidence he is discussing with you is only the evidence you heard in the courtroom?

A: Yes.

Q: If you have to be honest, I have to be honest. Can you set that aside and not consider it at all?

A: Yes.

The Court: Any questions?
Defense Counsel: Re-urge.

11. The *Houston Chronicle* article indicated that appellant and one accomplice killed the other accomplice subsequent to the offense.

The Court: It will be denied.

\* \* \* \* \* \*

Defense Counsel: The basis of my request for a mistrial is that it introduces the extraneous offense of the killing of [the accomplice] to the jury, and that's the basis of it.

The Court: All right, sir.

Defense Counsel: I understand it is denied.

The Court: Yes, sir. Before you bring [the next juror], bring me Ms. Romano back.

Q: [directed to Juror Romano, by the Court] I just want to ask you a quick question, Ms. Romano. The conversation you had with your sister, did you give that conversation or any of the parts of it to any other juror?

A: No, sir.

Q: You haven't mentioned it to them at all?

A: No, sir.

Q: You are instructed not to do so.

A: Yes, sir.

▆▆▆ For an accused to have a fair trial, the jury must decide his case on the basis of the evidence presented at trial. Therefore, when jurors converse with unauthorized persons about a case, injury to the accused is presumed and a mistrial may be warranted. *See* Tex.Crim.Proc.Code art. 36.22; Tex.R.App.Proc. 30(b)(7). The State may rebut the presumption of harm, however. *Thomas v. State*, 699 S.W.2d 845, 853 (Tex.Cr.App.1985). Here, the information conveyed to Juror Romano by her sister, brief though it was, was clearly prejudicial to appellant. Romano stated under oath, however, that she did not tell any other jurors about her sister's statement and that the statement would not influence her in reaching a verdict. The trial judge was in a position to observe Romano's testimony, and he apparently chose to believe it. On this record, we cannot say the trial court abused its discre-

tion in denying a mistrial.[12] *See Thomas.* Point of error number three is overruled.

▆▆▆ In point four appellant contends the trial court erred in denying his requested special issue asking the jury whether it considered appellant's inculpatory written statement. Appellant argues that "[d]enial of such [special issue] in these circumstances denie[d] the convicted defendant his full right to present mitigating evidence or argument at the punishment phase and his right to challenge the sufficiency of [the] evidence on appeal, and therefore necessarily violate[d] due process and due course of law guarantees."

The record reflects that the evidence presented at the pretrial suppression hearing regarding the acquisition of appellant's written statement (see above) was presented again at trial. The trial court, apparently out of an abundance of caution, instructed the jury pursuant to Tex.Crim.Proc.Code art. 38.23 anyway. That is, after being given the relevant law, the jury was instructed to disregard appellant's written statement if it believed, or had a reasonable doubt, that the statement was obtained unlawfully.

Before the charge was given to the jury, appellant requested that a special issue be included asking the jury whether it considered the written statement or whether it found the statement unlawfully obtained. At the time he made the request, however, appellant made no argument and cited no authority—constitutional, statutory, or otherwise—in support of his novel request. Any error has not, therefore, been preserved for our review. *Rezac v. State,* *supra* at 870. Point four is overruled.

▆▆▆ In point of error number thirteen, appellant argues the trial court erred in submitting to the jury at the punishment stage, over his objection, the Article 37.-071(b)(3) special issue, which asks: "[I]f raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the

**12.** Arguably the appellant waived any error in Romano's continued jury service when the trial judge offered appellant the option of proceeding with an alternate juror, and appellant's counsel answered "We'll keep her." See, e.g., *Barney v. State,* 698 S.W.2d 114 (Tex.Crim.App.1985); *Brooks v. State,* 642 S.W.2d 791 (Tex.Crim.App. 1982).

provocation, if any, by the deceased." Appellant argues that the special issue was unwarranted because it was not raised by any evidence at trial.

By the plain terms of Article 37.071(b)(3), the trial court *shall* submit the third special issue "if raised by the evidence." In the instant case, ample evidence was presented from the testimony of witnesses and from a written statement made by the appellant himself that the deceased had somehow managed to provoke his own death, by disobeying instructions from the appellant and his cohorts and, at one point, approaching appellant in a threatening manner. It therefore appears that the trial judge had no choice but to give the third special issue. *See Johnson v. State,* 629 S.W.2d 731, 733 (Tex.Crim.App.1981). Point thirteen is overruled.

■ In his fifteenth point of error, appellant argues the trial court erred in refusing his requested instruction, at the punishment stage, regarding evidence of appellant's uncharged misconduct.[13] The requested instruction would have instructed the jury that it could not consider any uncharged misconduct evidence with respect to special issue number one (deliberateness). *See* Tex.Crim.Proc.Code art. 37.-071(b).

The trial court did not err. Juries are free to consider uncharged misconduct evidence when answering special issue number one. *Harris v. State,* 790 S.W.2d 568, 589 (Tex.Cr.App.1989); *Rector v. State,* 738 S.W.2d 235, 242–243 (Tex.Cr.App.1986), cert. den., 484 U.S. 872, 108 S.Ct. 202, 98 L.Ed.2d 153 (1987). Point fifteen is overruled.

■ In point eleven appellant contends that the Texas "death penalty jury selection process [is] unconstitutional as applied" to his case because it "result[ed] in mostly white venireman being qualified for potential service." More specifically, appellant argues that the "selection process" violated federal and state guarantees of due process and equal protection of the laws because "black veniremen [were] struck *for cause* in a much higher ratio (50%) than blacks [were] represented in the venire (15%)." (Emphasis added.) We need not reach the merits of this argument, however, because it was not raised below. Point of error number eleven is overruled.

■ Appellant maintains in point fourteen that Article 37.071, as applied in this case, violates state and federal guarantees against cruel and unusual punishment because "there is no mechanism to charge the jury on mitigation-type evidence when the Defendant is not the killer-in-fact." *See* footnote 2, *ante.* The gist of appellant's argument seems to be that the jury could have found him guilty only as a party, and that therefore the jury should have been instructed that if it believed him guilty only as a party, then it could consider that circumstance in determining his punishment.

■ This argument has again not been preserved for our review. Although appellant stated vaguely at trial that he was "challenging the constitutionality of [Article 37.071]" because "[t]here is no way to allow mitigation on behalf of the defendant, who was not the triggerman," appellant did not request any particular instruction regarding the alleged mitigating circumstances of the offense. Nor did he press his objection to the point of an adverse ruling. Nor did appellant explain to the trial court—or to this Court—how the mitigating circumstance (if it is such) in question had relevance to his deathworthiness beyond the scope of the special issues mandated by Article 37.071(b). *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[14] Point fourteen is overruled.

**13.** At trial the State presented evidence that appellant had committed several felonies in addition to the murder of Steven Creasey.

**14.** The Eighth Amendment does not bar the imposition of the death penalty to a defendant guilty only as a party if the defendant was a major participant in the offense and exhibited at least reckless disregard for human life. *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). *See Cuevas v. State,* 742 S.W.2d 331 (Tex.Cr.App. 1987).

Finally, in his sixteenth point of error, appellant argues that statistical studies have shown that, in Texas, the death penalty is more likely to be assessed when the victim is white (as in this case) than when the victim is a member of a racial minority. Appellant contends this disparity renders his capital sentence invalid under federal constitutional guarantees of due process and equal protection and against cruel and unusual punishment.[15]

It is not difficult to answer this point of error. Appellant has provided no argument or authority whatsoever with respect to due process, and the balance of his point of error was rejected in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Point sixteen is therefore overruled.

The judgment of the trial court is AFFIRMED.

CLINTON, J., dissents.

BAIRD, J., concurs in result.

MALONEY, J., not participating.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

McCORMICK, Presiding Judge.

We granted appellant leave to file a motion for rehearing to address the merits of appellant's points of error four, seven through ten, and fourteen, and to reexamine our disposition of appellant's first and second points of error.

Viewed in the light most favorable to the verdict, the circumstantial evidence, in relevant part, supports a finding beyond a reasonable doubt that appellant, acting with

two others, was the actual triggerman who killed the deceased during a robbery. V.T.C.A., Penal Code, Section 19.03(a)(2). In his confession that was admitted into evidence, appellant claimed that one of the coactors was the triggerman. The jury was charged at the guilt stage that it could convict appellant of capital murder either as a primary actor or under the law of parties.

In his first and second points of error, appellant argues his written confession was obtained in violation of his right to counsel under the Fifth and Sixth Amendments to the Federal Constitution and Article I, Section 10, of the Texas Constitution.[1] Appellant claims the original opinion overlooked the significance of the exchange between himself and the magistrate before whom appellant appeared for a hearing in Houston just before he signed the confession. See *Robinson v. State*, 851 S.W.2d 216, 222–223 (Tex.Cr. App.1991); Article 15.17(a), V.A.C.C.P. We set out the relevant portions of that exchange here:

"Q. [By the Court]: Now, it's my understanding that, I guess sometime, was it yesterday, that I have also before me a statement of a person in custody. Do you know what that is, like a confession?

"A. [By Appellant]: Yes, sir.

"Q. And you know who Officer Kent, C.W. Kent is?

"A. No sir.

"Q. Okay. Do you know this man right here?

"A. Oh, yes.

---

15. Appellant also cites the corresponding provisions of the Texas Constitution, but, again, he has provided no argument or authority as to the protections provided by those provisions. *See* footnote 3, ante.

1. In his motion for rehearing, appellant asserts he cited authority "for the application of Texas constitutional law to the issue," and "he was not asking this Court to treat the matter differently from the federal courts, but to continue [the approaches of interpreting the State and Federal Constitutions as providing parallel protections] that seem to have been the norm." In neither

his original brief nor his motion for rehearing has appellant provided argument in separate grounds, with a separate substantive analysis and argument provided for each ground, on how the protection provided by the Texas Constitution differs from the protection provided by the Federal Constitution. See *Heitman v. State*, 815 S.W.2d 681, 690–91, n. 23 (Tex.Cr.App.1991); *Morehead v. State*, 807 S.W.2d 577, 579, n. 1 (Tex.Cr.App.1991). Therefore, only appellant's federal constitutional claims are properly before this Court.

"Q. Have I told you—if I told you his name was C.W. Kent, would you recognize him, wouldn't you?

"A. Yes.

"Q. You have talked to him, haven't you?

"A. Yes, sir.

"Q. Correct me if I am wrong, I have been told some things and I need to ask you to find out if they are true. That you talked to some officers, primarily Officer Kent, and he gave you some warnings. Did he not? Do you remember that?

"A. Yes, sir. He talked to me.

"Q. And you gave him a statement of some kind, did you not?

"A. Yes, sir.

"Q. And it's my understanding that this statement was typed out by somebody?

"A. Yes, sir.

"Q. A secretary of Mr. Kent.

"[By Officer Kent]: By me, sir.

"Q. By Officer Kent. It was typed out, and it's my understanding that because you have difficulty reading that somebody read it to you?

"A. Yes, sir.

"Q. And the whole thing?

"A. Yes.

"Q. Is that true so far?

"A. Yes, sir.

"Q. *And at that time you indicated to the officers that you wanted to think about whether or not you wanted a lawyer; is that correct?*

"A. Yes, sir.

"Q. Okay. But see, they didn't want you to sign it because they felt that you needed to be warned again and talked to by somebody and make sure that we all understand, you know, that we do what you want to do, not what somebody else wants you to do. You understand that?

"A. Yes. Sir.

"Q. So, I guess, basically what my job is with you today is, I have got this statement before me. And what do you want to do about this?

"A. I want to sign it, sir.

"Q. You want to sign it?

"A. Yes, sir.

"Q. *Do you want a lawyer?*

"A. *If I need one.*

"Q. *Well, see it's up to you. The only thing that I can tell you, I can tell you what your rights are,* you know. Okay. Before you make a statement you have to be told all these things that you have a right to not make any statement and that any statement you may make is probably going to be used against you at any trial down the way. You understand that?

"A. Yes, sir.

"Q. Okay. *That you have a right to have a lawyer present to advise you prior to and during any questioning. If you are unable to hire a lawyer, a lawyer can be appointed by the Court to advise you while you are being questioned.* You understand that?

"A. Yes, sir.

"Q. Okay. *And that you have a right to terminate an interview at any time.* Okay?

"A. Yes.

"Q. Now, the only thing I need to know is because you had indicated at one time that you wanted a lawyer, just like it said in these warnings, *they can't talk to you any more.* See?

"A. Yes.

"Q. If you want a lawyer, we'll get you one. If you don't want one, you don't have to have one. But if you choose, you are the one that has to make the decision as to what you want to do.

"A. *You mean if I want a lawyer present for me to sign that?*

"Q. *Yes.*

"A. No, sir. I want to sign it.

"Q. You want to sign it. You don't want a lawyer?

"A. No, sir.

"Q. You understand everything that we have talked about?

"A. Yes.

"Q. *Are you telling me you don't want a lawyer then?*

"A. *To sign that? No, sir.*

"Q. You get a lawyer to represent you. We are talking about this statement right here. That's all we are talking about right here. You tell me what you want to do.

"A. *I want to sign it.*" (Emphasis added)

Appellant argues in his motion for rehearing that after his "equivocal" request for counsel, the unusual circumstances of this case indicate he was inadequately informed of his right to counsel, and his waiver of counsel was not understanding or voluntary.[2] Appellant claims the magistrate should have advised him that his act of signing the confession "was what turned [the] inadmissible, inculpatory statement into an incriminating, admissible piece of evidence."[3] See Article 38.22, Section 1, V.A.C.C.P.

■ The magistrate had no legal duty to inform appellant of the significance of signing the confession, and his failure to do so does not make appellant's act of signing the confession involuntary. See *Phillips v. State*, 701 S.W.2d 875, 890–91 (Tex.Cr.App. 1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986) (failure of interrogating officers to inform defendant that he was the target of a capital murder investigation did not render defendant's confession involuntary), *overruled in part on other grounds, Hernandez v. State*, 757

S.W.2d 744, 751–52, n. 15 (Tex.Cr.App. 1988), cert. denied, —— U.S. ——, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992), *overruled in part, Fuller v. State*, 829 S.W.2d 191, 200 (Tex.Cr.App.1992). Under the circumstances of this case, the magistrate fulfilled his duty to clarify appellant's prior, equivocal request for counsel, and to inform appellant of his rights so appellant could intelligently and knowingly exercise them. See *Russell*, 727 S.W.2d at 576–77; Article 15.17(a), V.A.C.C.P.[4]

■ As we understand it, appellant also argues the magistrate inadequately informed him of his right to counsel in connection with his signing the confession. Appellant seems to argue the magistrate only warned him he had a right to counsel during the interrogation process, which was already over except for obtaining appellant's signature on the confession. Based on the portions of the record set out above, appellant was advised of his right to counsel in connection with his signing the confession. The record also reflects that after appellant made an equivocal request for counsel, he knew of his right to counsel and he voluntarily chose not to assert that right when he signed the confession. This is all the constitution requires. See *Russell*, 727 S.W.2d at 576–77. Appellant's first and second points of error are overruled.[5]

---

**2.** See *Russell v. State*, 727 S.W.2d 573, 576 (Tex. Cr.App.), cert. denied, 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 119 (1987) (a defendant's inquiry into interrogating officer's opinion on the necessity of the presence of counsel during interrogation is not a clear invocation of the right to counsel).

**3.** Appellant's motion for rehearing is directed to the conduct of the magistrate; he does not claim the interrogating officers violated his rights.

**4.** Cases such as *Russell* illustrate what interrogating officers may do when an accused makes an equivocal request for counsel. Here, the interrogating officers arguably afforded appellant more protection than he was entitled to under *Russell* by taking appellant before a neutral magistrate to clarify appellant's equivocal request for counsel instead of clarifying appellant's desires themselves. And, the magistrate arguably afforded appellant more protection than he was entitled to under Article 15.17(a)

when he advised appellant, among other things, that any statement he made "probably" would be used against him at trial. Compare id. (requires the magistrate to inform an accused that any statement he made "may" be used against him).

**5.** We also note that appellant's confession was the only evidence from which the jury reasonably could have found that appellant was not the triggerman. One of appellant's coactors died under suspicious circumstances before trial. The other coactor took the Fifth Amendment at trial and did not testify. A female companion of the victim's, who also was at the scene, was pretty sure appellant was the triggerman based on his voice and mannerisms and a process of elimination of the other two coactors as the triggerman. At punishment, appellant argued against imposition of the death penalty because he was not the triggerman.

 Appellant's fourth point of error asserts the trial court erred in denying at the guilt stage of trial his requested issue asking the jury whether it considered appellant's confession "or disregarded it pursuant to the court's charge." The magistrate, before whom appellant appeared for the hearing in Houston before he signed the confession, testified at trial on the circumstances of that hearing. The trial court, pursuant to Article 38.22, Section 6, V.A.C.C.P., instructed the jury not to consider appellant's confession unless it found beyond a reasonable doubt that it was obtained lawfully.

Appellant argues the harm flowing from the denial of his requested issue is as follows:

"In Appellant's case, if the jury disregarded the confession, they would have had to disregard it entirely, both the inculpatory and exculpatory portions, and their decision would have to be made upon the testimony of [three witnesses]. The argument might have taken on a far more aggressive and positive tone at punishment based upon such circumstantial evidence of Appellant's role. The point is not so much that the defense would have advanced a different specific argument, but that they would have had the *option* of altering the presentation of evidence (the Appellant himself might have testified) and argument. Further, counsel on appeal and this Court might have been in a different posture concerning a sufficiency of evidence argument on guilt or on one of the special issues: he would have been in a different position, in case he raised on appeal some other error in the charge that might require, under the dictates of [cite omitted] an evaluation of 'all the evidence' at trial to assess harm." (Emphasis in original.)

Appellant argues to deny him an answer to his requested special issue is to "deny him a fair trial and a fair appeal and therefore to deny him due process of law in violation of federal and state constitutional guarantees." [6]

Article 37.07, Section 1(a), V.A.C.C.P., provides for a general verdict in every criminal action; therefore, the trial court did not err in refusing appellant's requested issue. Moreover, appellant's allegations of harm are too speculative to demonstrate any constitutional violations. Appellant's fourth point of error is overruled.

Appellant's fourteenth point of error claims the special issues in Article 37.071(b), V.A.C.C.P., were unconstitutionally applied to him because they provided no mechanism for the jury to give mitigating effect to the evidence of appellant's non-triggerman status. Appellant, in effect, argues Article 37.071(b) allows him to be put to death "for merely being a party to a murder." He claims Article 37.071(b) as applied violates the Eighth and Fourteenth Amendments to the Federal Constitution and Article I, Section 13, of the Texas Constitution. However, only appellant's federal constitutional claims are properly before this Court. See *Heitman*, 815 S.W.2d at 690–91, n. 23; *Morehead*, 807 S.W.2d at 579, n. 1.

 Under the Texas capital murder scheme, a jury must not be precluded from giving effect to relevant, mitigating evidence in answering the special issues. See *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Cuevas v. State*, 742 S.W.2d 331, 346 (Tex.Cr.App. 1987), cert. denied, 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988). We have rejected similar federal constitutional challenges as that made by appellant here, and have held that special issue one of Article 37.071(b) clearly focuses the jury's attention on a defendant's individual conduct, and does not allow a defendant to be put to death for merely being a party to a murder. See *Cuevas*, 742 S.W.2d at 341–43, 350–51; see also *Belyeu v. State*, 791 S.W.2d 66, 71–74 (Tex.Cr.App.1989), cert.

---

**6.** As we understand it, appellant argues that since the jury could have convicted him of capital murder under the law of parties, he would have been in a better position at punishment to argue against imposition of the death penalty if he had an affirmative answer to his requested special issue. According to appellant, if the jury considered his confession, then it must have believed appellant was not the triggerman.

denied, —— U.S. ——, 111 S.Ct. 1337, 113 L.Ed.2d 269 (1991); *Tucker v. State,* 771 S.W.2d 523, 528–30 (Tex.Cr.App.1988), cert. denied, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989); *Westley v. State,* 754 S.W.2d 224, 231–33 (Tex.Cr.App.1988), cert. denied, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). In addition, special issue one has been interpreted as being tailored to permit an affirmative answer for a "major" participant in a capital murder involving multiple parties, but not for a "minor" participant. See *Cuevas,* 742 S.W.2d at 342–43. Special issue one provided a vehicle for the jury to give mitigating effect to appellant's nontriggerman status. See *id.* at 351.

Also, the jury charge at the punishment phase instructed the jury that the law of parties, as defined at the guilt stage, did not apply to the punishment phase. In closing arguments during the punishment phase, appellant argued his nontriggerman status militated against imposition of the death penalty, and the State did not argue for the application of the law of parties in answering the special issues. Under these circumstances, the jury could not have been misled into believing it could affirmatively answer special issue one because appellant was merely a party to a murder. See *id.* at 351–53.[7]

■ The United States Supreme Court also has recognized that special issue two of Article 37.071(b) allows the sentencer to consider "whatever mitigating circumstances" a defendant can show. *Jurek v. Texas,* 428 U.S. 262, 272–73, 96 S.Ct. 2950, 2955, 49 L.Ed.2d 929 (1976); see also *Cuevas,* 742 S.W.2d at 350. More importantly, Texas' capital murder scheme is constitutional "precisely because it does allow for consideration of mitigating evidence." See *Lackey v. State,* 819 S.W.2d 111, 120 (Tex. Cr.App.1989). Special issue two also provided a vehicle for the jury to give mitigating effect to appellant's nontriggerman sta-

tus. See *Lackey,* 819 S.W.2d at 119–120; *Cuevas,* 742 S.W.2d at 350.

Regarding special issue three,[8] appellant argues that since it "generally has no relevancy to a nontriggerman defendant and did not here, there is no way for mitigating evidence to be brought before the jury as the scheme presently exists." He further argues "there are no statutory instructions or special issues applicable to a nontriggerman defendant" under Texas' capital murder scheme. Special issues one and two provide a vehicle for the jury to give mitigating effect to evidence of a defendant's nontriggerman status. Therefore, we reject appellant's argument that there are no special issues applicable to a nontriggerman defendant. Appellant's fourteenth point of error is overruled.

■ Appellant's points of error seven through ten respectively assert the trial court erred in refusing his request to question veniremembers Davis, Edmonds, Webster, and Carroll before granting the State's challenges for cause to them. The record reflects that after preliminary questioning by the trial court, the trial court granted the State's challenges for cause to the veniremembers based on their views on the death penalty. A trial court's error in refusing to allow a defendant to question a veniremember will be deemed harmless if, at the time the trial court grants the State's challenge for cause, the veniremember, through questioning by the prosecutor or the trial court, made it absolutely and unmistakably clear that his views on the death penalty would have prevented or substantially impaired the performance of his duties as [a] juror in accordance with his instructions and his oath. *Perillo v. State,* 656 S.W.2d 78, 80–81 (Tex.Cr.App. 1983), cert. denied, 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608 (1989).

■ With respect to Davis, Edmonds and Webster, the record reflects they unequivocally stated they would automatically answer the special issues in such a way

---

**7.** See also *Johnson v. State,* 853 S.W.2d 527, 534–35 (Tex.Cr.App.1992, motion for rehearing pending).

**8.** Special issue three asked, "[W]as the conduct of the [appellant] in killing the deceased unrea-

sonable in response to the provocation, if any, by the deceased."

as to prevent imposition of the death penalty regardless of the facts. Therefore, refusing to allow appellant to question them was harmless. See *id.*

■ With respect to Carroll, appellant asserts she was almost a classic, "vacillating," *Perillo* juror.[9] We set out the relevant portions of Carroll's voir dire here:

"[BY THE COURT]: Now, I'm going to ask you a personal question.

"Now that you've seen the two [special issues] and you know the result of your answers to those two questions, do you yourself have any conscientious, religious, or moral scruples against the infliction of death—

"[By Ms. Carroll]: Yes.

"THE COURT: —as punishment for crime in a proper case?

"A. Yes. Yes.

"THE COURT: And your answer is?

"A. Yes.

"THE COURT: Now, is that absolutely in every case, no matter what—

"A. Every case. I just could not do it.

"THE COURT: It makes no difference to you what the facts and circumstances are?

"A. Makes no difference, no.

"THE COURT: Let me finish my questions, so that we'll get your answers on the record.

"Are you telling me that you would automatically, in every case, no matter what the facts and circumstances were, always answer those two questions in such a way that you knew the defendant would not receive the death penalty.

"A. That's right.

"THE COURT: Would your answer to that question always be the same, no matter what the facts and circumstances of any case might be?

"A. That's right.

"THE COURT: Could you ever participate with eleven other jurors and vote in such a way that you would answer those two questions yes, regardless of the facts, knowing that the death penalty would result if you answered the two questions yes?

"A. *Yes.*

"THE STATE: Judge, based on Ms. Carroll's (sic), we'll ask that she be excused for cause.

"THE COURT: You will be excused.

"APPELLANT'S COUNSEL: Your Honor, in order to render effective assistance of counsel to the defendant, may I put a few questions to the juror?

"THE COURT: No, sir. It was unequivocal." (Emphasis added.)

Appellant claims Carroll's final voir dire response shows she was a vacillating juror, and he argues we are bound by the record in reviewing this point. On this record based on the totality of Carroll's answers, the trial court was entitled to find she was unequivocal in her views against imposition of the death penalty no matter what the facts. See *Porter v. State*, 623 S.W.2d 374, 376–77 (Tex.Cr.App.1981), cert. denied, 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982).

Appellant's points of error seven through ten are overruled.

Appellant's motion for rehearing is denied; the trial court's judgment is affirmed.

OVERSTREET and MALONEY, JJ., concur in the result.

CLINTON, J., dissents.

BAIRD, Judge, concurring.

For the following reasons, I concur in the disposition of appellant's grounds for rehearing four and seven through ten and otherwise join the majority opinion.

### I.

In my opinion, circumstances may exist where an instruction similar to the one discussed in appellant's fourth ground for rehearing would be warranted. Contrary to the majority, I do not believe such an

---

9. In *Perillo*, the trial court reversibly erred in granting the State's challenge for cause to a vacillating veniremember without first giving the defendant an opportunity to question the veniremember. *Perillo*, 656 S.W.2d at 80–81.

instruction would be a verdict or special plea under Tex.Code Crim.Proc.Ann. art. 37.07(1)(a). However, such an instruction was not warranted in the instant case because appellant's confession was admissible. Therefore, appellant was not entitled to know whether the jury considered or disregarded the confession.

## II.

In relation to appellant's grounds for rehearing seven through ten, we should establish the following bright line rule: The trial judge does *not* err in refusing to permit counsel to question a venireperson who *unequivocally* states views regarding capital punishment that would prevent or substantially impair her performance as a juror.

For almost a quarter of a century, we have held that a trial judge errs by refusing to permit counsel to question a venireperson who has unequivocally stated that her views on capital punishment would prevent or substantially impair her performance as a juror. But the error has never risen to the level of reversible error. *Huffman v. State,* 450 S.W.2d 858, 860 (Tex.Cr. App.1970); *Ortega v. State,* 462 S.W.2d 296, 304 (Tex.Cr.App.1970); *Burns v. State,* 556 S.W.2d 270, 278 (Tex.Cr.App. 1977); *White v. State,* 629 S.W.2d 701, 706 (Tex.Cr.App.1981); *Sawyers v. State,* 724 S.W.2d 24, 29 (Tex.Cr.App.1986); and *Felder v. State,* 848 S.W.2d 85, 94 (Tex.Cr.App. 1992).

The only way we can reconcile the foregoing cases with the other cases pertaining to the improper limitation of voir dire examination is to conclude that the refusal is *not* error. To hold otherwise contradicts our holdings in *Nunfio v. State,* 808 S.W.2d 482 (Tex.Cr.App.1981), *Woolridge v. State,* 827 S.W.2d 900 (Tex.Cr.App.1992) and many more cases dealing with voir dire examination. Furthermore, we accomplish nothing by declaring something error if we habitually determine the error to be harmless. Consequently, we should establish the foregoing bright line rule and conclude that the trial judge did not err in refusing to permit appellant to question the venire-

persons complained of in grounds for rehearing seven through ten because each venireperson *unequivocally* stated that their views on capital punishment would prevent or substantially impair their performance as jurors.

With these comments, I join the judgment of the Court.