**George A. DISMUKES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–93–307 CR.**

Court of Appeals of Texas, Beaumont.

Submitted Oct. 3, 1995.

Decided April 10, 1996.

Tom Moran, Houston, for appellant.

Daniel C. Rice, District Attorney, Conroe, for State.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a conviction for the felony offense of Murder. Following its verdict, the jury further assessed appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of sixteen (16) years. Appellant raises seventeen points of error for our consideration. None of said points of error complain of the lack of sufficient evidence to sustain the conviction. We will group points of error for discussion when appropriate.

Point of error one reads, "The trial court erred in overruling Appellant's Motion to Suppress Evidence." Points of error two through sixteen each complain of the trial court's overruling of trial objections to specific items of evidence tendered by the State. The record reflects that all of said evidentiary items complained of on appeal were obtained by the authorities via search warrants.

At the outset, we feel it necessary to discuss the scope of the instant appeal in hopes of making clear to the parties what we are reviewing and how we are reviewing it.

We observe initially that both appellant and the State refer in their respective briefs to written "Findings of Fact and Conclusions of Law" of the trial court. The file of the instant appeal reflects that this Court received a "Supplemental Transcript" on April 26, 1994. On the same day the Clerk of this Court notified both parties by mail of the following:

> The Supplemental Transcript (1 vol.) in the above styled and numbered cause was received this date and marked "Recd Apr 26, 1994," but not filed. A Motion for Leave to File Supplemental Transcript must be filed before the Supplemental Transcript can be filed.

Our file in the instant case reflects no subsequent motion for leave to file the Supplemental Transcript was ever received. Therefore, the written findings of fact of the trial court are not a part of the appellate record and will not be considered by us for any purpose. Any mention or reliance on said written findings by the trial court in the appellate briefs will also be ignored by this Court.

Because the State's brief raises the issue of waiver of appellate review of appellant's points of error, we now focus our attention on what legal issues appellant preserved for our consideration. Aside from citations to cases, the only statutory or constitutional authority relied upon by appellant in his brief is the following:

TEX.CODE CRIM.PROC.ANN. art. 2.09 (Vernon Supp.1995)

TEX.CODE CRIM.PROC.ANN. art. 18.01(c) (Vernon Supp.1994)

TEX.CODE CRIM.PROC.ANN. art. 18.07 (Vernon 1977)

TEX.CODE CRIM.PROC.ANN. art. 38.23 (Vernon Supp.1994)

TEX. CONST. art. I, § 9

U.S. CONST. amend. IV

The transcript before us reflects only one written motion to suppress filed on appel-

lant's behalf by an attorney who ultimately did not represent appellant at trial. The pertinent portions of said written motion are set out as follows:

COMES NOW GEORGE ANDREW DISMUKES, the Defendant herein, and pursuant to the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution; Article I, Sections 10 and 19 of the Texas Constitution; and Articles 38.22 and 39.14 of the Texas Code of Criminal Procedure, respectfully moves the Court to suppress any and all oral and/or written statements allegedly made by the Defendant in connection with this cause and any and all tangible objects seized pursuant to any search of the Defendant, his residence, his vehicle or any vehicle in his possession or control and as a basis for said Motion would show the Court as follows:

I.

On or about December 24, 1991, the Defendant was arrested and/or detained by certain officers for the alleged offense. In connection with the arrest and/or detention, certain physical evidence and oral statements of the Defendant were obtained in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 10 and 19 of the Texas Constitution; and Article 38.22 of the Texas Code of Criminal Procedure.

We have examined the statement of facts of the trial in order to determine the oral objections made by appellant to the State's exhibits complained of in points of error two through sixteen. These objections range from the very general complaints that particular exhibits are the "product of an illegal search," and are objectionable "pursuant to our Motion to Suppress," to the arguably more specific objection that the search warrants and the affidavits were "invalid." At the suppression hearing conducted on September 17, 1993, appellant's trial counsel indicated that his complaint with regard to the search warrants was that the underlying affidavits lacked probable cause to support issuance of said warrants. In aid of our discussion of the scope of our review of the instant appeal, we reproduce portions of the colloquy involving the trial court, the State, and appellant's trial counsel at the suppression hearing prior to beginning the testimony:

The Court: All right. How do we want to proceed, [Trial Counsel]?

[Trial Counsel]: Judge, primarily this concerns around the time of the seizure of the truck and the door from it. At that point in time on the evening of the 24th, Mr. Dismukes had not been charged and was not—he went into the police station, but it was not by virtue of a warrant. I can put him on to testify that he—items were taken from his person and the truck door was taken from him and he was not being held under a warrant at that time and then I think the burden shifts I believe to the State once I do that to show that they had probable cause to seize the items of clothing and the door.

\*   \*   \*   \*   \*   \*

The Court: Okay. Of course [Trial Counsel] you're not the first lawyer that has appeared for Mr. Dismukes as we all know.

[Trial Counsel]: Right.

The Court: In the past some months ago—

[Trial Counsel]: Uh-huh.

The Court: There was a discussion and I believe it was primarily with the previous attorney for Mr. Dismukes.

[Trial Counsel]: Yes, sir.

The Court: To the effect that certain matters would be litigated about the suppression and certain matters might not. For example, if I recall correctly, at one time it seems to me that there was an agreement between counsel and the Court that the probable cause for the arrest was not in issue. The probable cause to be detained was not in issue. But that the method of obtaining certain incriminating items from the pickup truck or from his person—

[Trial Counsel]: Right.

The Court: That those were the matters to be disputed.

[Trial Counsel]: That's correct.

The Court: Are we still able to limit the evidence?

[Trial Counsel]: We are able to limit that the arrest of Mr. Dismukes came sometime after this.

The Court: Okay.

[Trial Counsel]: So I have no problem with that. And we can limit it today to the key area is the seizure of the evidentiary matters on the 24th and then I think there was a search warrant shortly after that where some items were seized from the house.

The Court: Okay.

[Trial Counsel]: But that is correct. And I have no problem limiting it to that and not going beyond that.

\*　　\*　　\*　　\*　　\*　　\*

The Court: Are you ready to sustain your burden, or do you feel like [Trial Counsel] needs to go further? Would you rather see him present testimony first?

[The State]: I don't have a problem going forward. I want to kind of clarify what we're going to litigate today, then. Because the motion to suppress addresses,—well, it's just—basically suppress everything. But there were just for—for reference to the Court there were four search warrants issued: One for Mr. Dismukes' blood; one for his residence in Country Village Estates and one for Ms. Gracie Dismukes' house on Memorial Drive in Houston and one for the pickup truck which was seized on December 24th, 1991. We also have basically three statements made by Mr. Dismukes to four different officers on December 24th of 1991 also which I think is included in the motion to suppress....

\*　　\*　　\*　　\*　　\*　　\*

The Court: I tell you what, I would almost prefer to do whether or not you had a question of admissibility about those statements, I would just as soon carry those forward to the trial unless you got an overwhelming—

[Trial Counsel]: I don't see any problem. Those are—I take it he's talking about statements made at the scene out there.

[The State]: Yes.

[Trial Counsel]: I would just as soon carry those with trial because if we go into that we're going to have to go into the whole case and I don't think that's what the point is today....

\*　　\*　　\*　　\*　　\*　　\*

[Trial Counsel]: I think on the search warrants at the house and later, Judge, probably those can be argued on their face as to whether or not the affidavit—

[The State]: Yeah.

[Trial Counsel]: —had sufficient probable cause in it. So we primarily will be concerned about the seizure on the 24th.

The Court: The pickup truck is the largest item. I mean it's the main item of contention, is it not?

[Trial Counsel]: Yes, sir.

The Court: Always has been?

[Trial Counsel]: Yes, sir, that's correct.

[The State]: There is no question, yes, sir.

The Court: So as far as testimony goes we would go to that first.

[The State]: Sure.

The Court: We will reserve any arguments about the search warrants until some time when we don't need witnesses.

[Trial Counsel]: Right. Exactly.

The Court: We primarily will litigate whether or not legal—

[Trial Counsel]: Probable cause was stated in the affidavit to each of those. I think that can rise and fall on that, then.

The Court: All right.

[The State]: You want to look at those real quick? I just offer the search warrants to you at this time, Judge.

[Trial Counsel]: Are you going to offer these into evidence? Take me some time to go through all of them. I don't have any objection to them coming into evidence.

The Court: He would rather start with the lawfulness of the truck in advance of the warrant.

[Trial Counsel]: Right, right. That way we can accommodate the witness.

[The State]: Oh, I see. I'm sorry.

The Court: Then we can—

[Trial Counsel]: Argue that on the face.

The Court: —examine the search warrant for legal sufficiency.

■ An examination of the rest of the rather extensive statement of facts indicates that any arguments made to the trial court as to why the search warrant affidavits were "insufficient" or lacked probable cause were either not recorded by the court reporter or not requested to be made part of the appellate record. All of this is to say that review of appellant's complaints on appeal is limited to any corresponding complaints contained in his written motion to suppress, and any corresponding oral objections made at trial. A careful comparison of the record before us with appellant's brief indicates that the only matching complaint is that the evidence in question was obtained in violation of the Fourth Amendment of the United States Constitution. All other appellate complaints do not correspond to trial objections nor do they correspond with complaints made in the written motion to suppress.[1] *Compare Curry v. State,* 910 S.W.2d 490, 495 (Tex.Crim.

App.1995); *Fuller v. State,* 827 S.W.2d 919, 927–928 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993). Therefore, our discussion of the law surrounding the admissibility of the evidence in question will be confined to the Fourth Amendment of the United States Constitution. With regard to an analysis of the search warrants, our review will be confined to addressing appellant's lone legally sufficient complaint voiced at the suppression hearing; that the search warrant affidavits lacked probable cause. Prior to addressing the legal sufficiency of the search warrant affidavits, however, we must address the issue of the warrantless seizure of appellant's truck which took place at the Montgomery County Sheriff's Department.

Points of error twelve and thirteen are the only points of error that complain of items of evidence taken from appellant's truck. The record reflects that appellant's truck was seized on December 24, 1991, the day that the murder occurred. The record further reflects that a search warrant for said truck was not issued until January 2, 1992, some nine days later. Appellant presents a two-pronged attack, *viz:* 1) that the initial seizure was unreasonable in violation of the Fourth Amendment, and 2) that the nine day delay

---

1. While not cited in appellant's brief, we are aware of a similar issue discussed in *Imo v. State,* 822 S.W.2d 635 (Tex.Crim.App.1991). In *Imo,* the defendant failed to specifically cite to art. 38.23 of the Code of Criminal Procedure in his appellate brief. The Texarkana Court of Appeals refused to suppress the evidence against Imo because he failed to invoke art. 38.23, Texas' exclusionary rule, in his appellate brief. The Court of Criminal Appeals reversed finding that the defendant's brief did refer to the record where he specifically requested the trial court to suppress the evidence pursuant to "the Code of Criminal Procedure," and ruled that the Court of Appeals should have considered art. 38.23 in its suppression analysis.

By contrast in the instant case, the record does not indicate that appellant ever requested suppression of the evidence "pursuant to the Code of Criminal Procedure." Instead, as indicated previously, appellant's oral trial objections were general references to his motion to suppress, while his motion to suppress only ·refers to the particular Code provisions art. 38.22 (when statements may be used), and art. 39.14 (discovery). Appellant's written motion also invokes Texas Constitution art. I, § 10 (rights of accused in criminal prosecutions) and art. I, § 19 (deprivation of life, liberty, etc.; due course of law).

Glaringly absent in his motion to suppress is any reference to art. I, § 9 which specifically provides protection against "all unreasonable seizures or searches." As observed by the Court in *Cook v. State,* 858 S.W.2d 467, 474 (Tex.Crim. App.1993):

"An objection stating one legal basis may not be used to support a different legal theory on appeal." *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Cr.App.1990). This is so because the trial judge did not have an opportunity to rule on that legal theory; nor did the State have an opportunity to remove the objections or supply other testimony. [citations omitted] Therefore, "nothing is presented for appellate review." *Rezac,* 782 S.W.2d at 871.

From the state of the record before us, we feel that appellant's art. 38.23 argument on appeal does not comport with his trial objections and thus precludes review of said Code provision by this Court. Appellant is still protected under the Fourth Amendment as warrants based on affidavits so lacking in evidence of probable cause as to render official belief in its existence entirely unreasonable do not fall within the "good faith" exception. *United States v. Satterwhite,* 980 F.2d 317, 320 (5th Cir.1992).

between seizure and issuance of the warrant was also unreasonable.

■ "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599, 608 (1984). However, "[d]ifferent interests are implicated by a seizure than by a search." *Id.* at 806, 104 S.Ct. at 3386, 82 L.Ed.2d at 609. "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Id.* Recognizing the generally less intrusive nature of a seizure, *see United States v. Chadwick,* 433 U.S. 1, 13, n. 8, 97 S.Ct. 2476, 2485, n. 8, 53 L.Ed.2d 538, 550, n. 8 (1977), *overruled on other grounds by California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970), the Supreme Court "has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible." *Segura,* 468 U.S. at 806, 104 S.Ct. at 3386, 82 L.Ed.2d at 609–610. The Court in *Chambers,* observed the following:

> Neither *Carroll* [*v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ], supra, nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords. But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in *Carroll* and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

\*    \*    \*    \*    \*    \*

Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Chambers,* 399 U.S. at 50–52, 90 S.Ct. at 1980–1981, 26 L.Ed.2d at 427–428.

In the instant case, mention is made by the State in its brief and in the discussion that took place prior to the motion to suppress hearing that at some point during the voluntary questioning of appellant on December 24, 1991, at the sheriff's department probable cause to arrest him arose. This is conceded by appellant, as noted above, during the prehearing discussion with the trial court. Nevertheless, as the record reflects, the lead detectives investigating the murder permitted appellant to leave the sheriff's department but required that appellant leave his clothes and truck. It has been noted that the law permitting a search of a motor vehicle based upon probable cause proceeds on a theory wholly different from that justifying the search of a motor vehicle incident to an arrest:

> "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law."

*Chambers,* 399 U.S. at 49, 90 S.Ct. at 1980, 26 L.Ed.2d at 427; quoting *Carroll v. United States,* 267 U.S. 132, 158–159, 45 S.Ct. 280, 287, 69 L.Ed. 543, 554 (1925).

■ Therefore, the level of probable cause that must arise before authorities may validly seize a motor vehicle in order to later

conduct a search of said vehicle following the issuance of a search warrant must be based upon the same test for probable cause that confronts an issuing magistrate when faced with allegations contained in a probable cause affidavit: the magistrate is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983).

In the instant case, the record reflects that Montgomery County Sheriff's Detective Francisco Hidalgo was the person who made the decision to seize appellant's truck on the night of December 24, 1991. Without setting out the evidence in detail, the record reflects that Detective Hidalgo's decision to seize appellant's truck, as well as appellant's clothes, was made after personally interviewing appellant, interviewing individuals who witnessed events surrounding the murder, viewing detailed photographs of the crime scene, and consulting with other sheriff's department personnel who had conducted the initial investigation at the crime scene. This is amply reflected in the following portion of Detective Hidalgo's direct examination testimony taken from the suppression hearing:

> [The State]: Well, why did you think there might be some evidence on Mr. Dismukes' vehicle?
>
> A. [Det. Hidalgo]: Well, it was—it was after I talked to him and the—the—the stories or at least the accounts of what he had said and what the Pickerings had said were so contradictory in terms of the sequence of events and how they could have occurred and then get—get, you know, and then things begin to—because I came into this thing cold from the very beginning, just walked into the office so I was kind of assimilating a lot of information real fast. But at that point I began thinking about what the Pickerings said with regard to him, you know, confronting people out on the roadways and things like that. And then began thinking that if the victim was

shot in such a surprised fashion as it was because, you know, it's not—it's not a—it's not natural reaction I think for somebody to get popped between the eyes and not either try to turn or something like that. I began maybe formulating a gut feeling that if there was another vehicle involved there was possibility that the shooting took place within very close proximity of the other vehicle and so—

> Q. Excuse me, Detective Hidalgo, after you talked to Detective Carrington and viewed the polaroids, did you come to the conclusion that it was a close wound that Mr. Tyson received?
>
> A. Based on what I saw in the photographs and what I had been told it was—it was obvious from the photographs and from the—what they had told me that the wound was close range nature.
>
> Q. Why is that?
>
> A. There was very clear stippling visible in and around the wound and the pattern of stippling was not very large.
>
> Q. Where was the wound on Mr. Tyson?
>
> A. About right here.
>
> Q. Was that on the forehead, close between the eyes?
>
> A. Yes, almost between the eyes. Kind of in the center of the forehead.
>
> Q. And so you determined that there may be evidence on Mr. Dismukes' truck?
>
> A. Well, I determined it from looking at what I saw that the other vehicle involved, there could be evidence on the vehicle because of the amount of blood letting. There could be blood evidence on it. There could be fingerprints. There really just any one of a number of things that I was thinking was going through my mind and—
>
> Q. Are you?
>
> A. I'm sorry.
>
> Q. I'm sorry. Are you familiar with, from other homicide scenes with something known as back spatter?
>
> A. Yes.
>
> Q. And what is back spatter?
>
> A. Back spatter is an occurrence that happens when a bullet or some type of

object strikes a bloody surface. Usually associated with a person, I mean, like skin or something like that. You—you, it's usually where—back spatter would occur with most types of bullet wounds where blood would be forced back in the direction of the force that the bullet is traveling.

Q. So that would be if there was no exit wound on Mr. Tyson then that would be blood that squirts back out of the entrance wound?

A. That's correct. It's either caused either by the projectile itself and from the high speed projectile or blood that would be gushing out as a result of the wound.

Q. And you testified I believe that there was apparently blood that had gushed out?

A. Oh, yes, there was a very copious amount of blood that I could see in the photographs.

Q. What all were you looking at as evidence on Mr. Dismukes' vehicle?

A. The thing that caught me right away was at least in terms of what I could see was blood, and the possibility that there may be blood on the vehicle and then the thing that really concerned me if Mr. Dismukes, like I said, at this point he was—this would have been after everything I put together from talking from the very beginning to the point to where I, he told me the contradicting statements and then decided he didn't want to say anything else, my concern was, if Mr. Dismukes' vehicle was in fact the vehicle and if Mr. Dismukes was in fact the suspect, the person who shot Mr. Tyson, that there would be some kind of blood or some kind of evidence on the truck and my immediate concern at that point was when I got there to the Sheriff's Office there was an "ithering blidgiot" rain storm taking place.

Q. Is that a light rain storm or heavy rain storm?

A. It was a pretty heavy rainstorm. When I got there it had begun raining. When I came back in toward Montgomery County, it began to rain before I reached the office.

Q. And Detective Hidalgo, from your past experience and dealing with a crime scene and blood in particular, what does rain have to do with blood?

A. Blood? Well, rain in terms of blood or any other kind of trace evidence or any other kind of evidence is very, very destructive. It's destructive to fingerprint evidence, it's destructive to blood evidence, it's destructive to just almost all kinds of trace evidence. In terms of crime scene, I am so paranoid about rain and crime scenes that I carry two or three big plastic tarps in my trunk because if I ever get out at a crime scene and it starts raining, I have 20 by 30 plastic pieces of tarp to cover the crime scene with. So it's extremely destructive.

Q. So after, was that then one of the reasons you didn't think you had time to get a search warrant because of the rain?

A. Oh, absolutely.

Q. Was the truck at that time out in the rain?

A. Yes.

Q. And it had been parked out in front of the Criminal Justice Center?

A. Yes, sir.

▆ Thus, under the facts and circumstances known to Detective Hidalgo at the time, and supported by the record before us, there existed a "fair probability" that evidence of the murder of Richard Tyson would be found on appellant's truck and that because of the weather conditions existing at the time, exigent circumstances existed for seizing the truck to preserve said murder evidence. Where, as held in *Segura*, 468 U.S. at 810, 104 S.Ct. at 3388, 82 L.Ed.2d at 612, the Fourth Amendment permits authorities to seize a suspect's dwelling on the basis of probable cause so as to prevent the destruction or removal of evidence while a search warrant is being sought, it cannot be seriously argued that the same Fourth Amendment prohibits authorities from seizing a suspect's vehicle based upon probable cause also to prevent the destruction of evidence. We find no Fourth Amendment violation in the initial seizure, based upon probable cause, of appellant's truck by the Montgomery County Sheriff's Department.

Appellant further complains of the delay in obtaining a warrant to search appellant's truck because, regardless of the holiday time frame, the residential search warrants were executed by a magistrate on December 30, 1991, proving that the extra three days it took the Montgomery County authorities to execute the search warrant for the truck was unreasonable. During his direct examination testimony, Detective Hidalgo explained the reasons for the delay as follows:

Q. [The State] To your knowledge, is trace evidence (sic) are you able to successfully remove trace evidence from a wet vehicle?

A. [Det. Hidalgo] Well, the dangers of processing any kind of evidence is that it's either missed or it becomes less pure, I guess you might say, in terms of what you might remove. It's—it's a standard procedure and pretty much accepted in the field that you try not to process anything wet. And so, what we did was secure the truck and it would allow ample time, probably a matter of two or three days for it to dry completely.

\* \* \* \* \* \*

Q. (By [The State]) Detective Hidalgo, why was there a delay? You seized the truck on December 24th?

A. Uh-huh.

Q. And executed the search warrant on the truck on January the—

A. Second.

Q. Second. What caused the delay in executing the search warrant on that truck? Or in obtaining the search warrant for that truck for that matter?

A. Well, it was combination of intervening important holidays. Shortage of personnel in terms of what we were trying to do. And the days after the 25th, we were engaged in going about four or five different directions and gathering more information with regard to the investigation. And the truck at that point was already in our custody. It was secured. It was going to take two or three or four days for it to completely dry probably and we were more concerned with evidence disappearing in the other location that we were

trying—that we were attempting to obtain search warrants for, so those were the concentrations initially.

Q. Well, Detective Hidalgo you already testified as to what you did between the time you seized the truck and the time you executed or obtained and executed a search warrant on the truck. Was that the earliest possibility that you could obtain the search warrant and execute it on the truck?

A. It was the earliest practical probability, yes.

Recall the Supreme Court's observation in *Chambers*, 399 U.S. at 51, 90 S.Ct. at 1981, 26 L.Ed.2d at 428:

"Where this [the opportunity to search a movable vehicle is fleeting] is true, as in *Carroll* and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant *for whatever period is necessary to obtain a warrant for the search.*" [emphasis added]

The above can be contrasted with the following observation taken from *United States v. Johns,* 469 U.S. 478, 487, 105 S.Ct. 881, 887, 83 L.Ed.2d 890, 898–899 (1985):

We do not suggest that police officers may indefinitely retain possession of a vehicle and its contents before they complete a vehicle search. Cf. *Coolidge v. New Hampshire,* 403 U.S. 443, 523 [91 S.Ct. 2022, 2066, 29 L.Ed.2d 564] (1971) (White, J., dissenting). Nor do we foreclose the possibility that the owner of a vehicle or its contents might attempt to prove that delay in the completion of a vehicle search was unreasonable because it adversely affected a privacy or possessory interest. Cf. *United States v. Place,* 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983).

■ The above quoted portion of the *Johns* decision may have legal viability under certain factual situations. However, the cases cited in support of the statements are inapplicable to the circumstances present in the instant case. First of all, the portion of *Coolidge* relied upon is taken from Justice

White's concurring and dissenting opinion. *Coolidge,* 403 U.S. at 523, 91 S.Ct. at 2066, 29 L.Ed.2d at 616. This cannot trump the precedential value of "held without a warrant for whatever period is necessary" contained in the majority's opinion in *Chambers, supra.* Second, any reliance on *United States v. Place,* is misplaced for the simple reason that *Place* involved a seizure based on "reasonable suspicion" and not probable cause. *Place,* 462 U.S. at 696, 103 S.Ct. at 2638–2639, 77 L.Ed.2d at 110. Reasonable suspicion permits only a temporary investigatory detention of persons or property. *Place* held that a 90–minute seizure of the defendant's luggage, based upon only reasonable suspicion, was unreasonable. The Supreme Court has not had occasion to address, for Fourth Amendment purposes, what, if any, time limitations are involved with regard to seizures based upon probable cause of non-contraband evidence of a crime. Until this occurs, we feel that the pronouncement in *Chambers* is authoritative and binding upon us. We therefore find that, having probable cause for the seizure of appellant's truck, the Montgomery County authorities were permitted to hold said truck for whatever period necessary in order to obtain a warrant for the search. Point of error one, to the extent it complains of the seizure of appellant's truck, and points of error twelve and thirteen are overruled.

The remaining points of error, excluding point of error seventeen, will be addressed together. Recall that the lone issue before us is whether, under the Fourth Amendment, the search warrant affidavits contained sufficient probable cause to support issuance of their respective search warrants.

In *Gates,* 462 U.S. at 238–239, 103 S.Ct. at 2332, 76 L.Ed.2d at 548, the Supreme Court rejected a rigid test for determining probable cause and reaffirmed the court's earlier "totality of the circumstances" analysis for probable cause determinations as follows:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability

that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for … conclud[ing]" that probable cause existed.

The affidavit supporting an application for a search warrant must provide the magistrate "[s]ufficient information … to allow that official to determine probable cause;" a wholly conclusory statement unsubstantiated by underlying facts is not sufficient to support a determination of probable cause. *Id.* at 239, 103 S.Ct. at 2333, 76 L.Ed.2d at 549. The magistrate may, however, draw reasonable inferences from the material supplied to him, and the "magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Id.* at 236, 103 S.Ct. at 2359, 76 L.Ed.2d at 547, *quoting Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637, 645 (1969). In doubtful or marginal cases, resolution of the question whether probable cause exists "should be largely determined by the preference to be accorded to warrants." *Gates,* 462 U.S. at 237, n. 10, 103 S.Ct. at 2331, n. 10, 76 L.Ed.2d at 547, n. 10.

In the instant case, each search warrant affidavit sets out a detailed account of the discovery and subsequent investigation of the murder. The two residential warrants sought to recover the following:

> Firearm ammunition or bullets consistent with .38 or .357 magnum caliber, both fired and unfired; Firearms capable of shooting ammunition consistent with .38 caliber or .357 magnum caliber; All clothing having suspected blood spatters or stains or gunshot residue; Any receipts, records, invoices, boxes, containers, or other objects or items documenting or indicating possession, purchases, sales, transfers, or usage of firearms consistent with .38 or .357 caliber.

In addition to the above described evidence pertaining to firearms and clothing, the search warrant for appellant's truck also sought recovery of the following:

> [G]unshot residues on surfaces of said vehicle; blood stains, blood spatters, or spatters of human tissue or bone on surfaces of

said vehicle; finger or palm prints found on surfaces of said vehicle belonging to the victim of the said murder, to wit: Richard Orville Tyson.

The affidavit for taking samples of appellant's blood is identical in detail to the other three affidavits but with the following additional information which is set out in a fashion typical of the minute detail of the investigatory processes described in each of the probable cause affidavits:

Affiant can state that on 01–02–92, a search warrant was executed on a 1988 year model Toyota pickup truck displaying Texas license plate number 3921NK. Affiant can state that the truck is owned by Mr. George Andrew Dismukes. A copy of said search warrant is attached to and included for all purposes as though set out in full herein. Affiant can state that suspected human blood was recovered from the driver's side door of the aforementioned truck and that said suspected human blood is now in the possession of Texas Department of Public Safety chemist, John Moran.

Affiant can state from his training and experience as a criminal investigator that it is possible to test and analyze human blood and determine if it came from a particular person. Affiant has spoken with Texas Department of Public Safety chemist, John Moran, and has been informed by Moran that in order to determine if the suspected human blood recovered from Dismukes' truck came from victim Richard Tyson or from George Andrew Dismukes, blood samples from both persons must be obtained and compared to the suspected human blood recovered from the aforementioned truck. Affiant can state that on 12–25–91, a blood sample was recovered from the body of Richard Tyson and that said blood sample was given to chemist John Moran. Affiant can state that based upon the aforesaid facts coupled with the conversation with chemist John Moran, that a sample of blood from George Andrew Dismukes must be obtained for comparison through scientific testing with the blood of Richard Tyson and the suspected human blood recovered from the door of

Mr. Dismukes' truck to determine if the blood is that of Tyson or Dismukes.

Affiant can state that Mr. George Dismukes has been charged and arrested for the murder of Richard Tyson and is presently on bond for said offense. Affiant requests authority to take custody of George Andrew Dismukes for only so long as is necessary for the extraction of his blood by a medical technician and that he be released from custody immediately upon completion of taking the said blood sample from George Andrew Dismukes.

Appellant also complains, with regard to the residential search warrant affidavits, that the constitution requires a "nexus" linking the offense committed, the place to be searched, and the item to be seized. Specifically, appellant contends that the residential search warrant affidavits fail to state "any facts which could lead a magistrate to believe that the evidence is located at the place to be searched or that Appellant had any connection with the place to be searched at the time the warrants issued." As to the latter complaint, the Montgomery County residence affidavit contains the following language: "2. SAID SUSPECTED PLACE AND PREMISES ARE IN CHARGE OF AND CONTROLLED BY EACH OF THE FOLLOWING PERSONS: George Andrew Dismukes." The Harris County residence affidavit provides the following language for the magistrate's consideration: "2. SAID SUSPECTED PLACE AND PREMISES ARE IN CHARGE OF AND CONTROLLED BY EACH OF THE FOLLOWING PERSONS: George Andrew Dismukes."

As for appellant's remaining nexus complaint, it has been held that nexus between the location to be searched and the evidence sought can be established either through direct observation or through normal inferences as to where the articles sought would be located. *United States v. Garcia,* 27 F.3d 1009, 1014 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 531, 130 L.Ed.2d 435 (1994). The Supreme Court in *Rugendorf v. United States,* 376 U.S. 528, 533, 84 S.Ct. 825, 828–829, 11 L.Ed.2d 887, 891 (1964), indicated that the test would be "substantial

basis," or in other words, based upon the affidavit, did the issuing magistrate have a substantial basis to conclude that the items sought were probably at the location designated in said affidavit?

■ In the instant case, we find that it would be normal to infer that appellant would keep his personal clothing as well as items indicating ownership or possession of .38 or .357 caliber handguns at his residences. The record reflects that the murder weapon was not recovered at the scene of the crime and that other witnesses indicated having seen appellant in possession of a handgun on past occasions. The evidence also indicated the fact that appellant returned to his Montgomery County residence after being seen leaving the area of the shooting. It is reasonable to infer that appellant changed out of any blood spattered clothing at said residence. We find that in each of the probable cause affidavits, including the residential affidavits, there was more than a substantial basis for the magistrates to conclude that probably some or all of the items sought were located at the places designated. We therefore overrule the remainder of point of error one, and overrule points of error two, three, four, five, six, seven, eight, nine, ten, eleven, fourteen, fifteen, and sixteen.[2]

■ Point of error seventeen states, "The trial court erred in overruling Appellant's running objection to the introduction of the fruits of the search of the townhouse in Harris County." This point of error is overruled on two bases. First, at the record reference provided in appellant's brief, appellant's trial counsel made no request for a running objection. Indeed, the colloquy at the bench ended with the following exchange:

> The Court: You got the Motion to Suppress, I hope that that preserves your error. I'm willing to recognize that you object to all of the products of the search.
>
> [Trial Counsel]: That's fine, that will save me from having to object to them.

We fail to see any request for a running objection from appellant's trial counsel. As such, nothing is presented for appellate review. Tex.R.App.P. 52(a). Furthermore, appellant's brief fails to provide any argument or authorities in support of his point of error. This renders said point of error inadequately briefed and, as such, will not be considered by this Court. *Robinson v. State,* 851 S.W.2d 216, 222, n. 4 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994); Tex.R.App.P. 74(f). Point of error seventeen is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.

BURGESS, Justice, dissenting.

In several respects, I respectfully dissent.

### The Truck Seizure and Search

The majority states: "Thus under the facts and circumstances known to Detective Hidalgo at the time, and supported by the record before us, there existed a 'fair probability' that evidence of the murder of Richard Tyson would be found on appellant's truck". The majority went on to find the seizure of Dismukes' truck was based upon probable cause. Within Detective Hidalgo's testimony are the following: [1]

Q: Well, why did you *think* there *might* be some evidence on Mr. Dismukes' vehicle?

A: ... I began formulating a *gut feeling* that *if* there was another vehicle involved there was *possibility* [sic] that the shooting took place within very close proximity of the other vehicle and so—

. . . .

Q: And so you determined that there *may* be evidence on Mr. Dismukes' truck?

A: Well, I determined it from looking at what I saw that the *other* vehicle involved, there *could* be evidence on the vehicle because of the amount of blood letting. There

---

2. Points of error nine and fifteen complain of the same exhibit (State's Exhibit 66), points of error ten and sixteen complain of the same exhibit (State's Exhibit 67), and points of error eleven

and fourteen complain of the same exhibit (State's Exhibit 38).

1. All emphasis are the writer's.

*could* be blood evidence on it. There *could* be fingerprints.

. . . .

Q: What all were you looking at as evidence on Mr. Dismukes' vehicle?

A: The thing that caught me right away was at least in terms of what I could see was blood, and the *possibility* that there may be blood on the vehicle ... my concern was, *if* Mr. Dismukes' vehicle was in fact the vehicle and *if* Mr. Dismukes was in fact the suspect, the person who shot Mr. Tyson, that there would be some kind of blood or some kind of evidence on the truck ...

None of the state's questions to Detective Hidalgo nor any of his answers contain the phrase "fair probability" much less the phrase "probable cause" or even the phrase "reasonable and articulable suspicion." The questions are couched in terms of "think", "might" or "may". The answers use "gut feeling", "possibility", "could" and "if". Detective Hidalgo stated no facts what so ever which lead to probable cause or even a "fair probability" that there was evidence on or within the truck. He had nothing more than a hunch or a possibility. This is not enough. Evidence obtained from the seizure of the truck should have been suppressed.

### The Residential Search Warrants

The majority holds, in essence, that the only nexus an affiant must show between the offense committed, the place to be searched and the items to be seized is the premises are in charge of and controlled by the person suspected of the offense. They justify this by stating: "... we find that it would be normal to infer that appellant would keep his personal clothing as well as items indicating ownership or possession of .38 or .357 caliber handguns at his residences.... It is reasonable to infer that appellant changed out of any blood spattered clothing at said residence." However, inferences must be based on facts. *See Johnson v. State,* 722 S.W.2d 417 (Tex.Crim.App.1986). There is the conclusion in the affidavit that Dismukes was in charge of or controlled each of the premises, but there are no facts in this regard. However the more serious defect is there are no facts that indicate Dismukes had been in either residence prior to or immediately after the incident. It is ironic that the affidavits for both residences are identical, yet the majority holds it a reasonable inference that appellant changed out of bloody clothes in two places and left one weapon in two places. Under their analysis, the number of residences to be searched is limited only to the number an accused is alleged to have charge of or control. There being no probable cause that the items to be seized were located within the places to be searched, the evidence obtained from the searches should have been suppressed.

Consequently, I would reverse and remand for a new trial.