John Everett SHELTON, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 07–98–0110–CR to 07–98–0115–CR.

Court of Appeals of Texas,
Amarillo.

Oct. 4, 1999.

---

Sue Walker, Fort Worth, for appellant.

Tim Curry, Criminal Dist. Atty., David M. Curl, Asst. Crim. Dist. Atty., Anne E, Swenson, Asst. Dist. Atty., Fort Worth, for appellee.

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

JOHN T. BOYD, Chief Justice.

In each of these six cases, consolidated for trial, a jury found appellant John Everett Shelton guilty of aggravated robbery. At the punishment hearing, appellant pled true to the single enhancement paragraph contained in each indictment and was sentenced by the jury in each case to 40 years confinement in the Institutional Division of the Texas Department of Criminal Justice. In this appeal, and in six issues, appellant challenges his convictions. Finding each issue to be without merit, we affirm.

The nature of appellant's challenges requires that we discuss the facts in some detail. We will discuss each offense separately and sequentially.

### The February 4, 1997 robbery of the Town & Country store in White Settlement

According to Marguerite Aline King, an employee of the Town & Country store, on February 4, 1997, at about 3:00 a.m. she was working alone when a man came into the store and robbed her. He was wearing dark clothing and "[h]ad a stocking cap on, ... a red mask, pulled down like all [sic] one piece ski type." He was carrying a gun which she described as having "a long barrel with an extraordinary big round hole at the end of it. Basically kind of a big long black gun." More specifically, she described the weapon as a "Luger," which, later testimony revealed, is a semi-automatic pistol.

With respect to the robbery, King testified the man "had the gun out and he was telling me not to look at him, to hurry up, he wanted the money, hurry, hurry." As she was getting the money, the man "suddenly [ ] flipped up his mask, stuck his gun in his waistband and took off out the door." At the time he did so, she averred, he was only about three feet from her, she was able to see his face and noticed that he had a grayish beard. After he left the store, she said she did not see any vehicle nor did she hear one. King immediately called 911 and police officers arrived shortly thereafter.

About a month and one half later,[1] King was contacted by the White Settlement Police Department and asked if she would come down and see if she could identify a suspect. When she arrived at the police department, she was shown a photographic lineup of six males, one of which was appellant. After looking at the photos, she was unable to make a positive identification, but there was one photograph she "kept going back" to. She then viewed the store video of the robbery at the same time looking at the photo spread. After doing so, she circled appellant's picture and wrote "[t]his is him." Additionally, at the time of the trial, King identified appellant in open court as the malefactor.

### The February 22, 1997 robbery of Eckerd Drug in Haltom City

On February 22, 1997, Iva Compton, an employee of Eckerd Drug, was working

---

1. Although King testified that it was "about" two weeks later, the record shows her identi-fication was actually made on March 21, 1997, about a month and a half later.

the 10:30 p.m. to 7:00 a.m. shift when a man approached her, took a gun out and said, "I need you to give me your money out of the register." She testified that her assailant was wearing black clothes, black gloves, black hat, "kind of wraparound glasses," and had a black gun. After she emptied the register and "the till" and gave the money to him, he ordered her to lie on the floor and he left. She immediately notified other store employees who were in the back and the police were contacted.

Compton averred that the robber's voice sounded like that of a white, middle-aged male. She testified that about a week to ten days after the incident, while she was working at the store behind the counter and at the register, she again saw the man who robbed her and, she said, her "hair stood on end 'cause I knew it was the same man." This time, she said, he was accompanied by a "very attractive black lady, probably five-six, five-seven, well dressed." When queried as to why she knew the individual was appellant, she replied that even though his appearance was not the same, appellant was the "same height, same build, same voice, same mannerism." Compton said appellant's presence made her feel "uncomfortable" and appellant came to the counter and said "[y]ou seem to not feel well, dear." A conversation between them then ensued in the course of which appellant suggested that Compton should either go home or see a doctor. With the comment "maybe I should," she gave appellant his package, and he left the premises. That exchange made Compton even more uncomfortable because, she reasoned, "no one else would be asking questions like that."

During her cross-examination, Compton testified that the gun used in the robbery had a round barrel that looked to be about eight to ten inches in length. Although she had identified appellant as her assailant from a photo spread, she was unable to identify him in open court as the culprit.

*The February 24, 1997 robbery at the Stop–n–Go in Arlington*

John Henry Underwood, an employee at the Stop–n–Go, testified that he was working the 11:00 p.m. to 7:00 a.m. shift on February 24, 1997, when "a gentleman came into our store and robbed us." The robbery took place at about 2:30 a.m. when Underwood was sitting in front of his register with a headache and a stomach ache and his head bowed. Another employee was working about ten feet from Underwood. There was an entrance about two or three feet from the register. Underwood noticed a man already inside the door with a gun in his hand. According to Underwood, the man was about five-six or five-seven in height, wearing a black hat, black sunglasses, and what appeared to be a black leather jacket. Underwood testified that he was unable to see the man's face fully because "he had some [black] form of covering that came up to just under his nose." He also said that "it looked like there was some facial fair [sic] from the exposed area on his face" which appeared to be "kind of graying, like the facial hair of an older gentleman."

With regard to the gun the interloper possessed, Underwood averred that it was a large caliber revolver with a barrel somewhere around six inches in diameter. The man pointed the gun at Underwood's chest and told Underwood to give him the money. Underwood was then instructed to lie face down on the floor and the man left. Underwood's fellow employee then pressed his security "pendant" and the police arrived on the scene about five to ten minutes later. Underwood never identified appellant as the man who robbed him.

*The February 24, 1997 robbery of a Texaco Food Mart in Arlington*

In the early morning hours of February 24, 1997, Texaco employee Brenda Kay Fuselier was accosted by a masked man who pointed a pistol at her and asked her

if she wanted to get shot. He then told her to go behind the counter and "pull the money out of the drawer." She described the man as a white male, about five foot three with gray hair, glasses, "a hood on— a hat on. He had a black jacket, looked like a leather jacket, I wasn't for sure." Although she said his appearance had changed, during trial Fuselier was able to identify appellant as the robber.

### The February 26, 1997 robbery of Lucky Lady Fina in Arlington

Amanda Young Hernandez testified that on February 26, 1997, she was working at the Lucky Lady Fina in Arlington. About 11:45 p.m., a man came up to the counter, put a gun in her face, and told her to give him money. Earlier that evening, a regular customer had come by and given her some information which caused her concern. Because of this, she stood by the window of the establishment while doing her paperwork so that she could see what was going on outside. As she did so, she noticed "a white newer model car, kind of like a sports car, looked kind of like a Grand Am or something." That description was consistent with the information she had received earlier from her customer.

She had returned to her paperwork when a man came in "with his turtleneck pulled up to about here [indicating] and a black leather hat, thick glasses, kind of like bifocals, and black leather jacket." She said the man walked up to her counter, stuck a gun in her face and told her to give him all the money. She described the man as being about five-one or five-two, in his late forties or early fifties, and with little gray hairs sticking out of his turtleneck. She also described the gun as being black with a long skinny barrel.

### The February 27, 1997 robbery of Jamie's Food Store in Keller

Carol Renee Cook, the manager of Jamie's Convenience Store in Keller, testified that about 4:00 a.m on February 27, 1997, a man came in with a gun. She described the man as being in his early to mid-fifties, about five-eight, stocky, dressed all in black, with "his face covered with the turtleneck part of his sweater," wearing clear, plastic surgical gloves, and carrying a black long barrel-type gun. Cook identified appellant from a photo line-up and in open court as the culprit in her robbery.

Johnny Robinson, a local newspaper distributor, arrived at the store about 4:00 a.m. to deliver papers. As he drove slowly by the store at a distance of 20 to 30 feet, he saw a man who looked as if he had just exited the building. He described the man as about five-seven or five-eight, dressed in black and with a beard. He described a hat the man was wearing as "sort of like an English cap." He also observed the man getting into a white "two-door sports car."

Out of the six cases with which we are concerned, video surveillance in five of them were introduced into evidence and shown before the jury. Every victim, except John Underwood either by photo spread and/or in open court, identified appellant as the malefactor.

With regard to the police investigation of the robberies, Officer Mark Weibel received information in March 1997 through the criminal analysis department of the Arlington Police Department about a string of robberies. Weibel testified he was given the *modus operandi* of the robber and his description. When working the 11:00 p.m. to 7:00 a.m. shift, he was called out on an unrelated assault. As a part of his investigation, he searched the area of the assault. In the course of that search, he saw a white male standing near a white Pontiac two-door parked in a parking lot. The sighting attracted his attention because "basically the description of this man was similar to the description that we had been looking for as far as the aggravated robbery suspects, that the person had committed numerous offenses in Arlington and in the metroplex." Weibel

described the man he saw as "a white male about 45 to 50, looked like he had a lot of gray hair, possibly a beard. He was about five seven, 170. He was wearing a dark, black leather-like jacket and had some pants on." When Weibel first saw him, the man was on foot and, as Weibel traveled toward him "to get a better look," the man "made a u-turn and began walking the other way rather hurriedly like he was trying to get away from me." Weibel then got on his public address system [the microphone in his car] and told the man that he needed to talk to him. However, the man did not stop in response to the request but "kept walking east, but it looked like he was even going faster now, like he was trying to avoid me." The last time Weibel saw him, the man "was going eastbound north of an apartment building." Weibel called another officer and the two searched the apartment complex to no avail.

After his unsuccessful search, Weibel walked back to the white Pontiac and conducted a "registration check" to see if the car had been stolen. When he did so, the dispatcher determined the vehicle was registered to Joyce Shelton, appellant's wife. At that time, about 3:00 a.m., Joyce was contacted and told the police that appellant was not at home and had gone to the store.

Several days later, Weibel gave his accumulated information to Detective Jerry Hataway. Because of that information, Hataway went to appellant's home and, as he did so, noticed a white Pontiac Grand Prix parked in front of the residence. Their suspicions being aroused, on March 14, 1997, they began surveillance of appellant's home. Hataway testified that appellant arrived home about 11:30 p.m. on March 14, 1997 and, as he was stepping out of his car, Hataway drove by in an unmarked police car within 10 feet of him. At that time, Hataway averred, appellant was dressed in a black bomber jacket, black turtleneck sweater and dark jeans and had a gray beard and gray hair. Hataway was able to identify appellant as the

person he had seen in the video surveillance tapes.

Later, after finding out that appellant was going out of town and would be returning on March 18 through the Dallas–Fort Worth Airport, surveillance was set up at the airport on that date and the police were able to photograph appellant. Hataway then prepared a photograph spread including appellant's photograph with that of five other males which, he said, had similar characteristics to those of appellant. He showed the spread to Amanda Young, the victim at the Lucky Lady, who identified appellant as the person who robbed that establishment.

After Young's identification, Hataway obtained a warrant to search appellant's home. After obtaining the warrant, Hataway went directly to appellant's home, arriving there about 2:30 or 2:45 a.m. He knocked on the door and called on the phone but was unable to obtain a response. Hataway and some Fort Worth officers who had met him at the home, then contacted the Fort Worth tactical unit. Upon their arrival, the unit officers entered the home and discovered appellant, his wife, and their daughter in the front living room and appellant was taken into custody.

The police then executed their search warrant and found several items that were received into evidence at the trial. Among those items were various items of clothing, including four black jackets, three of which were leather, a pair of black jeans, a pair of prescription glasses, and a black turtleneck sweater. They also recovered a black revolver with a six-inch barrel. The revolver was examined by Richard Ernest, the senior firearms examiner for the Tarrant County Medical Examiner's Crime Laboratory. He described the weapon as a Crossman model .357 pistol designed to shoot both .177 caliber BBs and pellets. He observed that the weapon was "a very good copy of the Colt Python .357 Magnum revolver." In describing the gun, Ernest said it was powered by $CO_2$ (carbon dioxide) inside its handle which held

$CO_2$ gas under high pressure. He described the gun as being in good condition. Ernest performed various tests on the gun and concluded that it had an average muzzle velocity of 390 feet per second using BBs and 335 feet per second using lead pellets. In conducting his tests, Ernest used a new canister because the one in the gun had only a half dozen shots left in it. As a result of his test, Ernest opined that "these pellet guns have sufficient velocity to penetrate through skin and have been known to cause death." He concluded his direct testimony by averring that the gun could cause death or serious bodily injury if it were discharged at a distance of three feet.

Upon cross-examination, he testified that a $CO_2$ cartridge normally contains at least "a hundred" shots and, although he attempted to test the velocity [pressure] of the canister in the gun, he was unable to do so. He admitted that the gun, at the time he received it, would not have been sufficient to be a deadly weapon. During re-direct examination, Ernest averred that when looking at the barrel of the gun, "it looks like you're looking at the end of a firearm barrel" and it could easily look like a .22.

Beginning our discussion of appellant's issues, we note that each indictment contained language similar to that set out below with the victim and date varying according to the particular occurrence:

John Everett Shelton, hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 26th day of February 1997, did then and there intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threaten or place Amanda Young in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to-wit: firearm, Count Two: and it is further presented in and to said court that the said defendant in the County of Tarrant and State aforesaid, on or about the 26th day of February, 1997, did then and there intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threaten or place Amanda Young in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a pellet gun, that in the manner of its use or intended use was capable of causing death or serious bodily injury, . . .

In his first issue, appellant challenges the legal and factual sufficiency of the evidence to support the deadly weapon finding in each of the six companion cases. Initially, we keep in mind that each indictment listed two theories by which appellant could have been found guilty of aggravated robbery. In finding appellant guilty of aggravated robbery, the jury must have found he used or exhibited a deadly weapon, and that deadly weapon was either a firearm pursuant to the first count or a pellet gun pursuant to the second. Consequently, because two counts were alleged, appellant was able to challenge the deadly weapon finding under each of the two theories.

Having said that, we point out that the respective standards for determining legal and factual sufficiency challenges are now so well established that we need not set them out again. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Narvaiz v. State,* 840 S.W.2d 415 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993), and *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim.App.1996). In performing our review obligation, we may not substitute our judgment for that of the factfinder. We are also obligated to remember the factfinder's exclusive power to 1) reasonably infer facts from the evidence; 2) resolve credibility issues; and 3) determine who to believe or disbelieve. *Depauw v. State,* 658 S.W.2d 628, 633–34 (Tex.App.— Amarillo 1983, pet. ref'd).

Supporting his evidentiary insufficiency proposition, appellant argues that a pellet gun does not meet the statutory definition of "firearm" because it does not contain an explosive device. In pertinent part, a "firearm" is statutorily defined as "any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use." Tex. Penal Code Ann. § 46.01(3) (Vernon 1994). Appellant argues that an "air gun," such as that here, is not a "firearm" because of its lack of an explosive device. We disagree. In *Campbell v. State*, 577 S.W.2d 493 (Tex. Crim.App.1979), even though an air pistol might not be designed to expel its projectile through the energy generated by an explosion or burning substance, if there is testimony that the air pistol was designed to fire a projectile capable of causing the death of a human being if fired from close range, that is sufficient to comply with the statute. *Id.* at 495–96. *See also Mosley v. State*, 545 S.W.2d 144 (Tex.Crim.App.1977) (op. on reh'g).

Appellant also contends that the pellet gun was not a deadly weapon at the time of the offense. In doing so, he contends that the gun's capability of causing death or serious bodily injury must be evaluated in light of the facts that actually existed at the time of the commission of the offense. *See Williams v. State*, 946 S.W.2d 432, 435 (Tex.App.—Fort Worth 1997), *rev'd on other grounds*, 970 S.W.2d 566 (Tex.Crim. App.1998). Inferentially, if not expressly, this argument would be that at the time of the robberies, in view of Ernest's testimony, there was not sufficient $CO_2$ in the cartridge to give rise to a muzzle velocity sufficient to seriously injure or kill a human.

Replying, the State contends appellant's argument is based upon several faulty premises. First, it reasons, in advancing the argument, appellant erroneously assumes that the air gun found in his home on March 19, 1997, almost three weeks after the last offense, was the weapon actually used in the six different robberies, second, the State argues, appellant assumes that under no circumstances can a $CO_2$ gun be considered a "firearm" or deadly weapon by design, and third, appellant's argument erroneously assumes that the $CO_2$ cartridge was in the same condition at the time of the robberies as it was when it was seized on March 19, 1997.

We agree with the State that the witness testimony that the robber was using a "Luger," a "semi-automatic," a "revolver," and a "gun," if accepted by the jury, as it evidently was, is sufficient to support the deadly weapon finding. *See Wright v. State*, 591 S.W.2d 458, 459 (Tex. Crim.App.1979); *see also Fletcher v. State*, 902 S.W.2d 165 (Tex.App.—Houston [1st Dist.] 1995, pet. ref'd). We also agree that the jury could reasonably have concluded from the evidence that the weapon actually used in the robberies was different from the $CO_2$ gun found at appellant's house. Moreover, even assuming arguendo that the evidence was sufficient to show the $CO_2$ pistol was the one actually used in the robberies, the testimony at trial was sufficient to support a conclusion that the pistol was a "firearm" or other deadly weapon *per se* within the purview of the statute. The jury also could have reasonably believed that the condition of the $CO_2$ cartridge was not the same at the time it was found as at the time of trial. The evidence is sufficient to sustain the deadly weapon findings. Because it presents no reversible error, appellant's first issue is overruled.

In his second issue, appellant contends that the sealed jury verdicts and jury notes deprived him of his ability to assert charge error and conduct a thorough prejudice and harm analysis under his remaining issues. However, the State points out that this issue became moot when this court granted his "Motion to View Sealed Documents and for Leave to File a Supplemental Brief." Appellant was given an opportunity to view the

sealed documents and 30 days within which to file a supplemental brief. Thus, no error is presented in this issue and it is overruled.

■ In his third issue, appellant claims he was erroneously denied a mistrial because of jury misconduct. To properly discuss this issue, we must give a brief recitation of the relevant facts. After Brenda Fuselier finished testifying, she was about to get on a courthouse elevator accompanied by two men, when four jurors who were waiting to get on the elevator stepped back and did not get on. Apparently the elevator went down one floor and came back up. As it did so, the jurors stepped on. The jurors then realized that Fuselier and her companions were still on the elevator, albeit at the back. Next, the jurors heard one of the men make a comment about appellant's case. It is not clear whether the remark was directed at the jurors or his companions. Nothing else was said and the jurors promptly reported the matter to the trial judge.

The trial judge promptly held a hearing in the course of which he individually questioned each of the jurors. At the conclusion of the hearing, the trial court expressly found each of the four jurors was credible when each of them averred they could follow the trial court's instructions and disregard the comments they heard. Furthermore, the trial judge was convinced that they had not told, and would not tell, any of the other jurors about the incident.

■ We begin our discussion by recognizing the well-established proposition that when a juror converses with an unauthorized person, harm is presumed. *Robinson v. State*, 851 S.W.2d 216, 230 (Tex.Crim.App.1991), *cert. denied*, 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994); *see also Quinn v. State*, 958 S.W.2d 395 (Tex.Crim.App.1997). However, that presumption is rebuttable. *Quinn*, 958 S.W.2d at 401. In determining whether the presumption has been rebutted, we are to give "almost total deference" to the trial court's resolution of issues turning upon an evaluation of credibility and demeanor and, in essence, view the evidence in the light most favorable to the trial court's findings or ruling, if there are no findings. *Id.* at 402.

Giving the trial judge the deference to which he is entitled, we cannot say the trial court erred in its decision. He questioned each juror individually and evidently was satisfied with their assurances that they would follow his instructions to disregard the incident and that none of them had told, or would tell, other jurors of the incident. Appellant's third issue is overruled.

■ In his fourth issue, appellant contends the trial court reversibly erred in overruling his objection to what he characterizes as the State's comment on his failure to testify. This attack arises from the following colloquy:

The State: ... Four police officers. They go to his door, they knock on the door, identify themselves and say, "[w]e've got a warrant for your arrest." And what response do they get?

None. They don't get any response.

And I've got to ask you: [i]s that the way an innocent person reacts?

Defense Counsel: Objection. That's a comment on the—any person's right not to be stopped or detained, that's a Constitutional right.

The Court: Objection is overruled.

The State: Is that the way a law-abiding citizen reacts when a police officer comes to your door with a warrant? You hunker down and act like it's going to go away?

The State responds that appellant failed to preserve the question for appellate review because: 1) That last portion of the argument above covered the same area and was made without objection; 2) appellant's trial objection was different from that now asserted by appellant; and 3) his trial objection was based only upon consti-

tutional grounds and thus was not sufficient to preserve any question about a violation of the Code of Criminal Procedure's prohibition against commenting about a failure to testify. Finally, the State asserts even if the issue was preserved, the prosecutor's argument was not a comment on appellant's failure to testify.

In reviewing the propriety of a prosecutor's argument, the appellate court must consider the entire argument rather than just isolated arguments. *See Mosley v. State,* 686 S.W.2d 180 (Tex.Crim.App. 1985). In doing so, the argument is viewed from the standpoint of the jury. *See Swallow v. State,* 829 S.W.2d 223 (Tex. Crim.App.1992). The test to be applied when a comment on a failure to testify complaint is made is whether the language used is manifestly intended or was of such a character that the jury would naturally take it to be a comment on the accused's failure to testify. *See Caldwell v. State,* 818 S.W.2d 790 (Tex.Crim.App.1991), *cert. denied,* 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992). Nevertheless, the argument may be improper if it points to a lack of evidence that only the accused personally can supply. *Swallow,* 829 S.W.2d at 225.

Applying the tests we have set out convinces us that under the foregoing evidence, even assuming the question was properly preserved, the State's argument was a reference to appellant's *behavior* when the police arrived, rather than a comment on his failure to testify. His behavior at that time was not something about which only appellant could testify. Accordingly, appellant's fourth issue is overruled.

In his fifth point, appellant charges that the trial court erred in overruling his objection to a portion of the State's argument during its closing at the guilt-innocence phase of the trial. The colloquy giving rise to this is as follows:

The State: What do we know about the night of the 10th of March?

Why was he [Shelton] there? Why was he avoiding the police? Could he have been armed? Could he have disposed of yet another firearm or weapon?

Defense Counsel: Judge, I'm going to object [—] that is not what the evidence shows, and it also does not show who was at that apartment complex on the 10th. There's been no identification.

The Court: Objection is overruled.

\* \* \*

The State: Is there some reason that he didn't stop and talk to the police officer? I mean, he's a minister. What's he scared of?

Defense Counsel: Objection, Judge. There's been no identification of John Shelton at that scene on that night.

The Court: Objection is overruled.

The State: ... He was out there about to hit someplace else in the same area he was hitting. Mr. Gregory said nothing got hit that night. You're durn right nothing got hit that night. Sergeant Weibel scared him to death.

Defense Counsel: Judge, I'm going to object to that. That's arguing outside the record.

The Court: Overruled based on the state of the record.

The *gist* of appellant's argument is there was no evidence that appellant was the man Weibel saw in Arlington on the night in question. Thus, he contends, the prosecutor's argument is pure speculation and injected new and prejudicial facts into the case. Although the State contends the question was not properly preserved for review, for the purposes of our discussion, we will assume the objection was sufficiently definite to preserve the question.

In the recent case of *Ingram v. State,* 978 S.W.2d 627, 632 (Tex.App.— Amarillo 1998, no pet.), we noted the rules that during jury arguments, counsel may include reasonable deductions from the evidence. In doing so, counsel may draw all

reasonable, fair, and legitimate inferences from the facts in evidence that the jury heard and observed in the courtroom during the presentation of evidence. *Id.* Counsel has wide latitude so long as the argument is supported by the evidence and made in good faith. *Id.* As evidenced by our detailed recitation of the facts in evidence, the prosecutor's argument was a reasonable deduction from the evidence. Moreover, even assuming arguendo it was error, viewed in its context and in light of the overall record, it was not so prejudicial as to deprive appellant of a substantial right. *See* Tex.R.App. P. 44.2(b). Appellant's fifth issue is overruled.

In his sixth and final issue, appellant challenges the factual sufficiency of the evidence to show he was the perpetrator of the Haltom City Eckerd Drugstore and the Arlington Stop–N–Go robberies. In doing so, appellant argues that the evidence connecting him with these two robberies is the fact that other robberies occurred in the same area. In responding, the State points out that Compton, the victim in the Eckerd robbery, identified appellant as the culprit from a photo spread and also during her testimony was positive in her identification of appellant. With regard to the Arlington Stop–N–Go robbery, Underwood, the victim, gave a very detailed description of the robber's clothing and the jury had the opportunity to view a surveillance video of that robbery. Additionally, each of the victims gave a detailed description of the perpetrator and the similarities of each of the companion cases are striking. We cannot say that the jury erred in its resolution of the evidence in these two cases and hold that they could reasonably have resolved that appellant was guilty of them. Appellant's sixth and final issue is overruled.

In final summary, all of appellant's issues are overruled and, in each case, the judgment of the trial court is affirmed.